## DAUBERT *v.* DAUBERT

[No. 339, September Term, 1964.]

*Decided June 25, 1965.*

The cause was argued before PRESCOTT, C. J., and HAMMOND, MARBURY, SYBERT and OPPENHEIMER, JJ.

*W. Walter Fernandis* for appellant.

*Edward S. Vidali,* with whom were *Fair, Vidali, Wagner & Evering* on the brief, for appellee.

OPPENHEIMER, J., delivered the majority opinion of the Court. HAMMOND, J., dissents. Dissenting opinion at p. 310, *infra.*

This case involves the custody of a six year old boy whose parents have been divorced. The parents, John M. Daubert and Patricia G. Williams, were married on December 14, 1952.

They have three children, two daughters, Debra and Darlene, now eleven and four years old respectively, and a son, Michael. The Dauberts separated in 1961. On April 2, 1963, the father, John Daubert, obtained a decree of absolute divorce on the ground of constructive desertion. The wife did not oppose the bill. The custody of all three children was awarded to the mother and the father was directed to pay twenty-five dollars a week for their support, which he has done. At the time of the divorce, Daubert testified that his wife was a fit and proper person to have the custody of the children. He now states that he so testified because at that time he was unable to provide a proper home for the children.

About one year prior to the separation of the Dauberts, they voluntarily agreed to send Michael to the home of his mother's parents, James and Elsie Williams; at that time both of the Dauberts were working. Michael needed special medical care, which the grandparents could afford to give. Michael has lived with his grandparents ever since, for a period of four years. Mr. and Mrs. Williams, who are respectively fifty-six and fifty years of age, live in a one-bedroom house in the Brooklyn area of Baltimore City; both of them work full-time. It has been necessary for Mrs. Williams to take Michael to the Brooklyn Community Nursery School each morning on her way to work; Mr. Williams calls for him each afternoon on his way home from work. It is undisputed that the grandparents have provided excellent care for Michael, at their own expense. There is general agreement that Mr. and Mrs. Williams are understanding, kindly people and have provided as good a home for the boy as their means permitted.

John Daubert, the father, remarried on May 18, 1963. His present wife is the former Charlotte Lotz, who was a widow with four children of her own, two of whom are approximately of the age of Michael. Daubert and his present wife live in a large nine-room cottage, with facilities for the erection of additional bedrooms. Three of the present Mrs. Daubert's children by her former marriage live in the house. She is not employed.

Michael's mother, the former Mrs. Daubert, remarried on December 31, 1963. Her present husband is Donald W. Gill,

who had recently divorced his second wife. He and Patricia, Michael's mother, live in a small rented home with three bedrooms, in the Pimlico area of Baltimore. Mr. Gill is employed as a truck driver and Patricia works full-time at the Social Security Administration. The girls, Debra and Darlene, live in this house and evidently have made a good adjustment and are happy.

On November 12, 1963, John Daubert filed a petition in the Circuit Court Part II of Baltimore City asking for the custody of all three children. Patricia Gill, the mother, filed an answer asserting that it would be in the best interest of the children if custody remained with her and also filed a petition asking for an increase in the amount of support to be paid by her former husband.

Testimony was taken before Judge Prendergast which developed the marital histories and present circumstances of the parties. Mrs. Ellis, a Director of the Brooklyn Community Nursery School in which Michael is enrolled, testified that Michael "is an unusual child many times" although at other times he acts normally. There are times, in Mrs. Ellis' opinion, when he is really hard to cope with. She feels that Michael needs to be corrected and "a firmness." In a previous letter, Mrs. Ellis had stated that Michael has always needed special care. She testified that, in her opinion, "[t]he only reason that I would feel that Michael should be removed from the home— and maybe not that now—if anything should happen to Mrs. Williams, then I think that Michael should be with his father." She was of the opinion there is no present reason why Michael should be removed from the home but also stated: "Well, I think it would be a wonderful thing for the child to be with his own father and his new mother if they would provide the proper home for him."

Mr. Karlin, Probation Officer of the Circuit Court of Baltimore City, who had made an investigation for the court in this matter, was of the opinion, as a result of his investigation, that the present arrangements with respect to the three children should not be changed. He had interviewed the present Mrs. Daubert and thought she was a very capable woman and that there would be no question as to her ability to provide a good

home for Michael. Patricia, the present Mrs. Gill, in his opinion, was not able physically, because of her home conditions, to take care of Michael, but Mr. Karlin felt that, if the care of Michael were taken away from Mr. and Mrs. Williams by the court, Mrs. Gill should be given his custody.

Mr. and Mrs. Williams both testified. Michael sleeps in the only bedroom in their house; the Williams sleep on the sofa-bed in the living room. Mrs. Williams testified that Michael has constantly been under the doctor's care ever since he has been with them. "[H]e never did seem to grow up well * * * He needs a lot of special care that just an ordinary child doesn't require." He has asthma trouble and has had an operation on his ears. Mr. and Mrs. Williams enjoy Michael and feel they can give him more personal care, which he needs, than either his mother or his father.

Michael's mother, the present Mrs. Gill, when asked by the court what she proposed to do when Michael could no longer stay in the nursery school, said that she hoped to get him in McDonogh and believes that her parents would pay the necessary expense. She also said that at the nursery school older children are sometimes permitted to stay on to help with the younger ones.

The present Mrs. Daubert testified that, from her observation, all three of the Daubert children feel insecure because of the breakup of their home. She has found her present husband to be a good influence on her own children and believes that she could grow to love his children as much as her own.

Daubert and his present wife are Catholics. Patricia is a Protestant, although her present husband is what he describes as a "non-practicing Catholic"; the two Daubert girls attend the Catholic church. Michael, who is described as being a Catholic, which Judge Prendergast interpreted to mean, perhaps, that he had been baptized, is taken by his grandparents to a Protestant church each Sunday.

Several days after the conclusion of the testimony, Judge Prendergast filed a memorandum in which he recited the facts, gave his impression of the witnesses and analyzed and weighed the circumstances which he deemed controlling. In his analysis of the facts, Judge Prendergast referred to the general agree-

ment as to the fine character of Mr. and Mrs. Williams. As to the present Mrs. Daubert, Judge Prendergast said: "Mrs. Charlotte Daubert made an excellent impression on the court and seems to be a dedicated mother to all the children for whom she is caring at present. She alone, of all the potential custodians of the children in dispute, is not employed and is available at all times to care for them."

In his discussion, the judge referred to the recommendation of the Probation Department that the present custodial situation remain unchanged. The judge agreed that the two daughters are receiving proper and adequate care at present and that no change should be made as to them. He disagreed with the recommendation that Michael should remain in the custody of his mother. The judge pointed out that, under the present arrangement, Michael, for an indefinite period, would remain in the custody of his maternal grandparents. As to this, the judge said: "Inevitably he will get the impression, if he has not already done so, that he is not wanted by either his father or mother. This is borne out by the information which the Probation Officer obtained from the boy's kindergarten principal who said that he 'appears to be very confused by the home situation'." The judge then considered the physical facilities available for Michael's care, with particular reference to his school attendance. The judge said: "The Brooklyn Community Nursery School is for the care of children of pre-school age. Michael is now of school age and is about to enter the first grade. While Mrs. Williams testified that the Nursery occasionally accepts children several years past elementary school age, this is not really what the Nursery is equipped to do. Undoubtedly, Michael's continuance in the Nursery School would be of short duration so that as long as his grandparents are employed, as they are, they will not be able to care for him properly in the near future. It is exceedingly doubtful that it would be wise to continue to keep a red-blooded boy in a nursery school for infants, as the respondent suggests be done here. It is quite significant that Mrs. Elizabeth Ellis, the director of the Nursery School, testified that 'it would be nice if the boy were with his real father and new mother.' Mrs. Ellis is a lady of vast experience with young children and probably

knows Michael as well as any of the persons in this case." The judge then considered Michael's religious training, noting that his father wishes to have him brought up in the Catholic faith. Under the circumstances, the judge felt that the father's wishes with respect to the boy's religious training should be respected.

The court concluded that the care and custody of Michael should be awarded to his father. He ordered that the father should continue to pay twenty-five dollars weekly to the Probation Department for the care and support of the two daughters, subject to the further order of the court, and retained jurisdiction so as to make any changes in custody which may prove necessary as the result of future developments.

The father did not appeal from the portion of the decree continuing custody of his two daughters with their mother. Mrs. Gill, the mother, during the hearing, had withdrawn in open court her petition to have the present support payments increased, so that the only question presented is the mother's appeal from so much of the decree of the lower court as awards custody of Michael to his father.

Citation of authority is no longer necessary for the fundamental rule that, in questions of custody, the paramount, overriding consideration is the welfare of the child. Courts generally deal with the legal results of past action; here, the question is a choice between limited alternatives for the unpredictable future of a boy already handicapped by his parents' separation. Prescience is not a judicial attribute. Some legal principles have been evolved in custody cases, which may or may not be applicable to the particular circumstances. The facts, not the law, must guide judicial judgment. "[N]o general principles can be laid down in this class of cases * * *" *Barnard v. Godfrey,* 157 Md. 264, 272, 145 Atl. 614 (1929). "[T]he real dilemma generally stems from the endeavor to apply the established principles of law to the facts and circumstances * * *" *Hild v. Hild,* 221 Md. 349, 357, 157 A. 2d 442 (1960).

In the limitless kaleidoscope of personalities, environment and economic facts, patterns may emerge to which one or another legal aphorism may seem applicable. So, in this case, the mother claims as apposite the principles that, in general, the mother is considered the natural custodian of the young,

*Glick v. Glick,* 232 Md. 244, 248, 192 A. 2d 791 (1963); that, ordinarily a divided control of children is to be avoided; and that the fact a mother works does not bar her as her child's custodian. *Roussey v. Roussey,* 210 Md. 261, 123 A. 2d 354 (1956). The appellee refers to cases where circumstances led to the award of custody to the father. *Sibley v. Sibley,* 187 Md. 358, 362-63, 50 A. 2d 128 (1946); *Sewell v. Sewell,* 218 Md. 63, 145 A. 2d 422 (1958); *Carter v. Carter,* 156 Md. 500, 144 Atl. 490 (1929).

"In general", "ordinarily", "other circumstances being equal" and like phrases, are invariable limitations of any general rule in custody. In our approach to the review of decree awarding custody, we have emphasized the vital role of the chancellor who hears the case. In *Sibley v. Sibley, supra,* Judge Collins, for the Court, said:

> "We see none of the parties. The chancellor had the parties and the witnesses before him. He was able to observe their demeanor and general appearance while on the stand, to judge of their character, probable attitude toward and their probable influence over the infant. He also had the opportunity to talk to the infant. Unless there is some reason to the contrary, his findings ought not to be disturbed." 187 Md. at 362.

Judge Prendergast saw, heard and appraised all the persons interested in Michael's custody and obviously brooded over the disposition of the case. He weighed the natural desires of the mother and her parents against what, to him, seemed best for Michael's future. The judge emphasized Michael's confused emotional status, which, in Judge Prendergast's opinion, called for life with the only parent who is presently in a position to take him, rather than a continued residence with his grandparents, however selfless and kind. In this decision, the judge was influenced by the physical and educational facilities available in the father's home and was particularly influenced by his impression of the present Mrs. Daubert as an understanding woman. On the matter of religion, it is not the father's wishes which are necessarily controlling, but the court can consider the added subconscious strain on a six year old boy of

being brought up in a religion different from that of his father and sisters, whatever the religions involved may be. *Levitsky v. Levitsky,* 231 Md. 388, 398-399, 190 A. 2d 621 (1963), and authorities therein cited. The retention of jurisdiction over the matter of custody is a proper recognition of the uncertainties of life.

In view of all the circumstances, we cannot say that the chancellor's decision was wrong.

*Decree affirmed; costs to be paid by appellant.*

HAMMOND, J., filed the following dissenting opinion.

I dissent reluctantly and only because I have been compelled to conclude that the best interests of the boy will be furthered by keeping him with his grandparents, who have demonstrated that they can lovingly and effectively raise him in a good home in which he is content and happy. Determining the best interests of a child in a custody or adoption case results from applying judgment to the set of circumstances involved, and try as I can, I am not persuaded that the careful, sincere and conscientious efforts of Judge Prendergast below and Judge Oppenheimer for the Court on appeal to exercise such judgment wisely have been achieved. For the facts and inescapable inferences which the record and the opinion below and on appeal paint clearly for all who are interested to see (and which it is not necessary to emphasize further), neither the father nor the mother offer the boy anything like the chance that the grandparents do to develop character, achieve a good lay and religious education and achieve success and happiness as a useful citizen.

I would reverse.