# SHELL OIL COMPANY *v.* HARVEY RYCKMAN

[No. 1138, September Term, 1978.]

*Decided July 9, 1979.*

The cause was argued before MORTON, MOORE and LOWE, JJ.

*Neil J. Dilloff,* with whom were *Gerard P. Uehlinger* and *Piper & Marbury* on the brief, for appellant.

*Robert K. Nead,* with whom were *O'Doherty, Gallagher & Nead* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

Harvey A. Ryckman leased a service station from Shell Oil Company in 1969. Despite the legislative declaration since 1964 that indemnity clauses in such leases might be void as against public policy, Md. Ann. Code art. 53, § 40,[1] the lease contained the following provision:

> "Lessee shall indemnify Shell against all claims, suits, loss, cost and liability on account of injury or death of persons or damage to property, or for liens on the Premises, caused by or happening in connection with the Premises (including the adjacent sidewalks and driveways) or the condition, maintenance, possession or use thereof or the operations thereon."

On June 30, 1970, Ryckman's infant son, Terry, was injured by a piece of glass falling from a roll-type overhead door in the service station building. Ryckman, on behalf of his son and himself, sued Shell.

---

1. "Any provision of a lease or other rental agreement relating to real property whereby a lessee or tenant enters into a covenant, agreement or contract, by the use of any words whatsoever, the effect of which is to indemnify the lessor or landlord or hold the lessor or landlord harmless, or preclude or exonerate the lessor or landlord from any or all liability to the lessee or tenant, or to any other person, for any injury, loss, damage or liability arising from any omission, fault, negligence or other misconduct of the lessor or landlord on or about the leased or rented premises or on or about any elevators, stairways, hallways or other appurtenances used in connection therewith, and not within the exclusive control of the lessee or tenant, shall be deemed to be against public policy and void."

Now Md. Real Prop. Code Ann. § 8-105 (1974).

In addition to denying liability by plea, Shell counterclaimed against Ryckman alleging in its two count counterattack that in tort Ryckman's negligence was the sole cause of the accident, and contractually (pursuant to the indemnity clause) that it was indemnified by Ryckman who, under the lease, "had the sole responsibility for maintaining" the service station premises. The issues before us relate solely to summary judgments granted Ryckman, and denied Shell on its counterclaim.

The Negligence Count

—parental immunity—

Judge James W. Murphy granted Ryckman summary judgment on the negligence count of the counterclaim. He reasoned that the tort claim was founded upon the negligence of the father and that Shell (which to recover must stand in the shoes of the son) was, as a matter of law, precluded from suing the father because of the doctrine of parental immunity.

That doctrine holds that ordinarily recovery for damages for negligence is not allowed between parent and child because of the relation in which the parties have stood to each other. *Schneider v. Schneider,* 160 Md. 18, 21-24 (1930); *Latz v. Latz a/k/a Schafer,* 10 Md. App. 720 (1971). Immunity does not apply however, where the reciprocal dependence and entitlement of that relationship expires upon the child's reaching maturity and emancipating himself from parental control, *Waltzinger v. Birsner,* 212 Md. 107, 125-126 (1957); nor does it apply where the parental relationship is abandoned by cruel and inhuman treatment of the child or for malicious and wanton wrongs against him. *Mahnke v. Moore,* 197 Md. 61 (1951).

—the business exception—

It is upon the *Mahnke* exception that appellant, Shell, would have us reverse the summary judgment on the negligence count of the counterclaim. Shell argues that an exception for

4

business activities would constitute a logical extension of the *Mahnke* reasoning.

*Mahnke* presented an extreme set of facts; the Court reasoned that the actions of a minor child's father in killing the child's mother in front of her, keeping her with the dead body for several days and thereafter shooting himself in her presence, represented a complete abandonment of the parental relationship and, therefore, abrogated the rationale for applying parent-child immunity. Appellant argues that the same principle of abandonment of the parental relationship operates here. Contending that the father employed the child, Shell argues that the primary relationship while at work is that of employer-employee rather than parent-child.

We decline appellant's invitation to extend the exception for two reasons. First, appellant included no evidence in the record extract to establish the employee-employer relationship to which it avers. We choose not to address the contention without evidentiary support being supplied to us pursuant to Md. Rule 1028. We note that at oral argument appellant conceded that the son was not a regular employee at the station, but argued that he did "help his father." It appears unlikely that a viable argument for a business activity exception could have been built from the facts of this case, even if such an exception were available. Thus, even if we recognized the merit of such an exception, we would not apply it in this case.

Beyond that, however, we recently indicated in *Montz v. Mendaloff,* 40 Md. App. 220, 224-225 (1978), that *Mahnke* does not represent an expandable exception to the parent-child immunity doctrine, but instead should be narrowly construed. *Montz* reaffirmed the sentiment of *Latz v. Latz a/k/a Schafer,* 10 Md. App. at 733-734:

> " '[W]e believe it particularly fitting that any change in the parent-child immunity rule should be by legislative action .... The legislature in Maryland has been aware of the immunity under the *Schneider* decision for 40 years and has taken no action to change it.' " *Montz v. Mendaloff,* 40 Md. App. at 223.

We affirm the summary judgment granted by Judge Murphy against Shell on the negligence count.

## The Contract Count

### —the indemnity clause—

Judge Murphy denied Ryckman's summary judgment motion as to the contract count. Subsequently Shell sought one thereon in its favor, but Judge Sodaro denied the motion. Ryckman then filed another motion for summary judgment on the contract count, arguing this time that the indemnity clause in the lease was statutorily invalid. Presumably appellee had belatedly discovered Md. Ann. Code art. 53, § 40. *See* note 1 *supra.* Judge Sklar (who heard the motion immediately preceding the trial to be had on Terry's initial suit) granted summary judgment, so we are told and have verified by the docket entry.[2] Without benefit of either the order or his opinion to guide us (see Md. Rule 1028), we assume from the motion that it was granted because of the § 40 statutory prohibition against indemnity clauses in leases. That is the argument addressed in this appeal in any event. If that was Judge Sklar's reason for granting summary judgment, we will hold that his conclusion was proper but his reason was wrong.

This is one of the difficulties with addressing issues without the benefit of either order or opinion upon which the issues are founded. We have both to raise and exorcise all spectral possibilities, some argued and others not. The time must come when we enforce more rigidly our technical rules of procedure such as Rule 1028. *But see Sergeant Company v. Pickett.* 285 Md. 186 (1979).

### —exclusivity—

Shell contends, and we agree, that if Judge Sklar granted summary judgment because the indemnity clause was

---

2. Shell settled with Terry "at the trial table." Its concern here is with its right to seek indemnification under its counterclaim which was aborted by the summary judgments.

statutorily void, he was wrong. The statute proscribing exculpatory clauses by its language does not apply to any lease wherein the lessee or tenant has "exclusive control" of the premises.

Ryckman contends that he does not have exclusive control because paragraph 5 of the lease prohibits him from making

"any attachments or additions to, or any structural alterations of, any building on the Premises, or construct any additional buildings or structures on the Premises, without Shell's prior written consent.",

and although paragraph 7 charges him with promptly repairing or replacing damage to the premises, it further provides that

"if Lessee fails so to do, Shell may make such repairs or replacements and charge to Lessee the actual cost thereof or, in lieu of making such repairs or replacements, may charge to Lessee a sum equal to the reasonable cost of such repairs or the reasonable value of such replacements."

Additionally under paragraph 7, Ryckman contends that Shell retained

"the right to enter the Premises at any time for the purpose of inspecting the same and making repairs, replacements and additions."

From these provisions, Ryckman would have us believe he was denied "exclusive control" of the premises and, therefore, the statutory prohibition against such exculpatory clauses applies. These provisions are standard in any lease to preserve from despoliation the landlord's property. If we view them excised from context and emphasized to indicate a desired result, we violate the directive that the terms of a contract must be viewed as a whole rather than separately. *Rigger v. Baltimore County,* 269 Md. 306, 312 (1973).

The lease executed between the parties vested control of the service station premises in appellee. Paragraph 1 of the

lease demised to appellee all of the land, buildings, improvements and equipment comprising the service station. Paragraph 11 of the lease provides that "the entire control and direction of . . . [the] business and operations shall be and remain in Lessee . . . ." Although not discussing art. 53, § 40, in *Macke Co. v. Housing Management Co.,* 38 Md. App. 425, 429 (1978), while noting that we have no articulated standard in Maryland by which to determine whether a landlord has reserved control over property in common, we held that:

> "Whether a landlord has retained control over the premises is essentially a matter of intention to be determined in the light of all the significant circumstances, particularly the leases and practices of the parties." (footnotes omitted).

There is no indication in the extract that evidence of practices exist shading or equivocating the clear language of the lease. Absent such evidence or language that is ambiguous, the lease construction is a matter of law for the court. *Gov't Employees Insur. v. DeJames,* 256 Md. 717, 720 (1970); *Keyworth v. Industrial Sales,* 241 Md. 453, 456 (1966). We see no ambiguity on this point. The provisions in paragraphs 5 and 7 relied upon by Ryckman are standard protective measures against waste, not indicative of an intent to subvert the lessee's exclusivity of control of the premises. *Cf. Riggers, supra* at 312. If that is not so, there is no purpose in the exclusivity exception in the statute. No lease would ever be construed as exclusive.

### —waiver of immunity—

Shell has prevailed in sustaining the viability of its indemnity clause; now it must convince us that by agreeing to indemnify Shell for "all claims," Ryckman waived his immunity from suit as a parent. Since Shell volunteered settlement with Terry, to permit it to recover from the father vicariously enriches the son at his father's expense, a result the parental immunity doctrine sought to avoid.

We touched upon the question of what is sufficient to indicate a contractual waiver of that immunity in *Montz v.*

*Mendaloff,* 40 Md. App. 220. In light of *Schneider v. Schneider,* 160 Md. 18, we declined to hold that a parent who contracts to insure against her negligence negated the immunity rule by so doing. *Montz, supra* at 224.

Our concurring Chief Judge bemoaned the failure of the court to reevaluate the parent-child immunity doctrine in light of Maryland's compulsory automobile insurance law. He "believe[d] it to be inconceivable that the average parent entering into a contract with a motor vehicle liability insurance carrier knows that he is excluding from the protection of the policy his minor children, the ones he ordinarily is most desirous of protecting." *Id.* at 228-229. Nonetheless, the panel found there had not been a waiver of immunity and the Chief Judge was forced reluctantly to concur that such was the state of the law.

This case carries us one step farther than *Montz.* If we cannot infer that when one contracts to protect all the world from his negligence, he did intend to protect his own children, *Montz, supra,* then can we properly infer that a parent who broadly contracts to indemnify a landlord "against all claims ... on account of injury ..." contemplated waiving his immunity so he could indemnify a landlord who might settle a claim with his son? As Ryckman asked us to read too broadly the specific repair clauses of the lease, so we think Shell asks us to read too much specificity into a general indemnity clause.

It is presumed that parties contract with a knowledge of the existing law — in this case the law of parental immunity — and such law becomes a part of the contract unless expressly rejected as inapplicable. *See Montz, supra* at 228-229; *Denice v. Spotswood I. Quinby, Inc.,* 248 Md. 428, 433-434 (1968); *Crockett v. Crothers,* 264 Md. 222, 227 (1972); *Winterstein v. Wilcom,* 16 Md. App. 130 (1972).

> " 'Generally, unless a contract provides otherwise, the law applicable thereto at the time and place of its making, including constitutional and statutory provisions and judicial precedents, is as much a part of the contract as though it were expressly referred

to and incorporated in its terms; and the same is true of the law of the place where it is to be performed. The reason for this rule ordinarily is that it is presumed that the parties had such law in contemplation when the contract was made.'" *Denice v. Spotswood I. Quinby, Inc.,* 248 Md. at 433-434, quoting 17A C.J.S. *Contracts* § 330 (1963).

This principle provides little assistance in the present case. Assuming both parties contracted cognizant of the parental immunity, must we not assume that Shell would have intended the general language of indemnification to waive the immunity? This compels a judicial imputation of a specific intent where none exists. On the other hand, assuming Ryckman's cognizance of it, how can we assume he would intend to waive his own immunity solely to his or his child's detriment, when in *Montz* we declined to do that when the result would have been to the parent's and child's benefit? This construction has at least the benefit of requiring that we add nothing by judicial imputation.

The answer seems to lie in facing head on a policy decision. If we are to be consistent with *Montz* and *Schneider,* we must hold that any waiver of parental immunity must be expressly indicated. Waiver of that immunity will not be "presumed" or "inferred" from broadly written, stock language indemnity provisions. Had we been free to digress from the rigidity of *Schneider,* we would have readily done so in *Montz* as indicated by Chief Judge Gilbert's compelling reasoning.

Common sense dictates that the parties at the time of contracting did not contemplate the circumstances pressed upon the court in this case. To "presume" an intent to waive presupposes "contemplation" of these circumstances; that would allow a legal fiction to fly in the face of reason and to prevail. We will not so presume.

*Judgment affirmed.*
*Costs to be paid by appellant.*