605 A.2d 172

Alice BIENENFELD (Bennett–White)

v.

**Reider J. BENNETT–WHITE.**

**Nos. 183, 1518, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

April 29, 1992.

**490**

John A. Austin, Towson, for appellant.

James A. Helfman, Baltimore, for appellee.

Argued before GARRITY, WENNER and HARRELL, JJ.

HARRELL, Judge.

A principal issue raised by this child custody case is whether evidence of the religious views or practices of a party seeking custody may be considered by a court in

making a custody determination. We hold that such evidence may be considered, along with other factors impacting upon the child's welfare, if such views or practices are demonstrated to bear upon the physical or emotional welfare of the child. We also hold that the chancellor in the instant case did not abuse his discretion by considering such evidence.

## Facts

Appellant, Alice Bienenfeld (hereinafter "the mother"), and appellee, Reider J. White (hereinafter "the father"), were married on 17 September 1977. Three children were born of the marriage, Reider Junior (hereinafter "Reider") on 28 June 1979, Shannon on 2 February 1981, and Vernon on 22 August 1983. The parties separated on 3 June 1988, and agreed informally to share custody of the children. They also agreed that the children would reside primarily with the mother, subject to liberal visitation privileges for the father. The father moved to an apartment, while the mother and the children continued residing at 201 Sandee Road in Timonium, Maryland, where the family had lived for seven years.

When the parties were married both were members of the Episcopal faith. On 8 May 1988, however, the mother and the children converted to Orthodox Judaism. While the father agreed to the children's conversion, the parties had different interpretations of the significance of the father's agreement. The mother testified at the trial on the merits that she believed and desired that, from the time of the conversion, the children's religious upbringing would be strictly according to the tenets of Orthodox Judaism. The father explained that he did not understand the children's conversion, or his agreement thereto, to preclude him from exposing the children to the Episcopal faith. The parties' failure to meet minds on this issue foreshadowed a series of bitter conflicts between them over the religion and education of the children.

On 8 May 1989, the mother filed a complaint for divorce and request for injunctive relief against the father in the Circuit Court for Baltimore County, alleging, in part, that the father had "embarked upon a program of mental and emotional harassment and torment" of her. She requested, *inter alia,* an order granting her temporary custody of the children. The father answered and filed a counterclaim for temporary and permanent custody, alleging that the mother had attempted to prevent him from visiting the children.

On 8 August 1989, the parties and their attorneys appeared for a hearing before a domestic relations master. The parties informed the master that they had agreed to the entry of an order providing for joint legal custody of the children, with the mother to have physical custody and the father to have visitation rights similar to those informally agreed upon earlier. The agreement, which was recited and consented to on the record, also provided generally that the parties would cooperate with respect to each other's religious activities with the children, and that the children could attend a private Jewish day school at the expense of the mother. The basic contents of the agreement was memorialized in an order drafted by the mother's counsel and entered by the circuit court on 12 October 1989.

In spite of the agreement, clashes over the religion and education of the children continued unabated. Several legal skirmishes occurred before the trial on the merits, including one involving the mother's enrollment of the children in the Community Day School of Beth Tfiloh (hereinafter "Beth Tfiloh") in the fall of 1989 and one involving the children's vacation in the spring of 1990.

The trial on the merits was heard by a chancellor, The Honorable James T. Smith, Jr., commencing 26 June 1990. The chancellor found that both parents were fit, but that the children did not fare well with the mother's then fiance, Sam Bienenfeld. For some time, the mother and the children had been in the practice of staying at Bienenfeld's apartment on Sabbaths and religious holidays because of its

proximity to their synagogue.[1] The chancellor found that the children were "bored" and "unhappy" at the apartment due to a lack of stimulating activities in and around the apartment, and that there were personality conflicts between Sam Bienenfeld and the children. The chancellor also found that living in the Sandee Road house offered the children an important form of stability. "Sandee Road has been very important. They have friends in the neighborhood. They have activities that they enjoy, and can describe, when they are home, and they are generally happy, and it is important that they have that stability."

In addition, the chancellor found that the parties had agreed after their separation that the children would be exposed to both the Orthodox Jewish and Episcopal faiths, but that the mother believed that their agreement was otherwise. He found that the mother had attempted to restrict the children's access to the father because of her view that the children's religious upbringing should be exclusively Orthodox Jewish. The chancellor found that the father had a cooperative attitude toward the mother's religious activities with the children, so long as he was allowed to expose them to his own religion and his access to them was not unduly restricted.

The chancellor concluded that the best interests of the children required that the father have physical and legal custody and use and possession of the Sandee Road house. He granted liberal visitation rights to the mother,[2] and ordered a detailed, shared schedule of holidays, including visitation during the Jewish holidays of Rosh Hashanah, Yom Kippur, Hannukah, Passover, and Shavuot. Additionally, the chancellor required the father to allow the children

---

1. It was Sam Bienenfeld's and the mother's practice not to drive on Sabbaths or religious holidays.

2. The chancellor granted visitation to the mother on alternate weekends and Wednesday evenings and, beginning in 1991, five weeks during the summer. He granted her visitation for four weeks during the summer of 1990.

to continue attending Beth Tfiloh, so long as the children qualified to attend and the mother paid the entire cost of their attendance.[3] Following the entry of the chancellor's order on 29 June 1990, the mother filed a motion for a new trial which was subsequently denied. The mother filed a timely appeal.

On 25 July 1991, the father filed a motion for permission to enroll Reider in Ridgely Middle School, a public school. The mother answered and filed a motion for contempt. The motion for contempt was premised on the father's refusal to pay half the costs of a mathematics tutor for Shannon, as allegedly required by the 29 June 1990 order, and on the father's contacts with Ridgely Middle School prior to his filing of the motion for permission to enroll Reider there. The mother contended that such contacts constituted contempt of the chancellor's order that the children continue to attend Beth Tfiloh.

Both motions were heard by the chancellor commencing on 13 August 1991. The chancellor found that, while Reider's preference for public school had not changed, the circumstances surrounding his preference had changed. More specifically, the chancellor found that Reider, who was at that time thirteen years old, was entering the middle school level, and that Beth Tfiloh had done nothing to evaluate the special educational needs he would have at that level. The evidence showed that Reider had certain learning problems, particularly with written comprehension and spelling, and that he had been in an individualized education program in public school before his enrollment in Beth Tfiloh. The chancellor found that Reider would be guaranteed evaluation of the special educational needs he would have at the middle school level in public school. Further-

---

3. During the trial on the merits the oldest child, Reider, expressed a strong desire to attend public school. The chancellor found, however, that Beth Tfiloh and the public school, which the children had previously attended, were academically equal, and that continuing to attend Beth Tfiloh, which they had attended for the past year, would provide more stability for the children.

more, the chancellor found that Reider had exhibited increased signs of anxiety since the time of the trial, and that giving him greater control over important decisions in his life, such as which school he attended, would help alleviate this anxiety and foster in him a positive sense of independence. Finally, the chancellor found that Reider was entering a stage at which most boys and girls at Beth Tfiloh prepare for their bar or bas mitzvah.[4] He found that Reider did not wish to be bar mitzvahed, that he was acutely aware of this difference between himself and his peers at Beth Tfiloh, and that the emotional stress or tension caused by this perception would not be present if Reider attended public school.

The chancellor concluded that the best interests of Reider required that he be allowed to transfer to a public school. In an order dated 15 August 1991, the chancellor granted the father's motion, treating it as a motion for modification of the 29 June 1990 order. The chancellor also dismissed the mother's motion for contempt, finding that the actions complained of did not constitute contempt of the 29 June 1990 order.

In addition, the chancellor modified the schedule of shared holidays to provide that Reider could miss no more than one school day in connection with religious observances for each of four Jewish holidays for which the mother had visitation rights. This modification was evidently necessitated by the fact that Reider would no longer be attending Beth Tfiloh, where school was not in session during those holidays. Finally, the chancellor required that Reider, the mother, and the father participate in such psychological counselling as might be recommended by Dr. P. Gayle O'Callahan, the costs to be divided equally between the parties. Dr. O'Callahan, a clinical psychologist, had

---

4. A bar mitzvah is an initiation ceremony recognizing a Jewish boy's attainment of the age of religious duty and responsibility. A bas mitzvah recognizes a Jewish girl's attainment of the same age.

counselled Reider previously and had consulted with both the father and the mother.

The mother filed a motion for a new trial or, in the alternative, to alter, revise or amend the 15 August 1991 order. After a hearing on the motion, the chancellor ordered minor modifications of the wording of the order. The mother then filed another appeal. By order of this Court, the mother's appeals were consolidated.

We shall include additional facts as necessary in our discussion of the issues presented.

The mother raises a number of issues for our consideration, which we have recast as follows:

    I.   Did the chancellor abuse his discretion in awarding legal and physical custody of the children to the father?

    II.   Did the chancellor abuse his discretion in considering evidence of the views and practices of the mother regarding the children's religious upbringing in making his custody determination?

    III.   Did the chancellor's decision infringe upon the mother's constitutional right to free exercise of religion?

    IV.   Did the chancellor abuse his discretion in modifying the 29 June 1989 custody order?

    V.   Did the chancellor abuse his discretion in denying the mother's motion for contempt?

## I.

*Did the chancellor abuse his discretion in
awarding legal and physical custody
of the children to the father?*

Initially, the mother contends that the chancellor improperly applied the "best interest of the child" standard because he was considering a change of custody previously ordered by the court. The mother contends that the proper standard was whether there was evidence of a material

change in circumstances affecting the welfare of the children. We disagree.

On 12 October 1989, physical custody of the children was awarded to the mother upon the agreement of the parties. We are mindful that the father never consented to the exact wording of the 12 October 1989 order. Nevertheless, it is clear that the order reflects the agreement made by the father during the hearing before the master that the mother would have physical custody of the children. "We have treated as 'final,' subject to modification upon a sufficient showing of change, custody orders entered by the consent and upon the agreement of the parties." *McCready v. McCready*, 323 Md. 476, 483, 593 A.2d 1128 (1991) (citations omitted).[5]

> In the limited situation where it is clear that the party seeking modification of a custody order is offering nothing new, and is simply attempting to relitigate the earlier determination, the effort will fail on that ground alone.

> \*     \*     \*     \*     \*     \*

> In the more frequent case, however, there will be some evidence of changes which have occurred since the earlier determination was made. Deciding whether those changes are sufficient to require a change in custody necessarily requires a consideration of the best interest of the child. Thus, the question of 'changed circumstances' may infrequently be a threshold question, but is more often involved in the 'best interest' determination, where the question of stability is but a factor, albeit an important factor, to be considered.

---

**5.** We note that we previously have held that there is no need for a party seeking custody to show a change of circumstances when the other party has custody by virtue of a *pendente lite* award of custody. *Kerns v. Kerns*, 59 Md.App. 87, 97, 474 A.2d 925 (1984). Kerns is inapposite to the case before us, however. Unlike in *Kerns*, the agreement-based custody order in the instant case, like the one in *McCready*, was not designated to be a *pendente lite* or temporary order.

*Id.* at 482, 593 A.2d 1128. *See also Domingues v. Johnson,* 323 Md. 486, 498–500, 593 A.2d 1133 (1991) (discussing relationship between question of changed circumstances and best interests standard in modification of custody case).

■ In the case before us, there was sufficient evidence of changes occurring since the entry of the agreement-based custody order to justify the application of the best interests standard. For instance, the agreement-based order provided for equal visitation during the children's spring vacation. Spring vacation coincided with Passover, and the mother, fearing that the children's religious observances would be interrupted, sought to prevent the father from visiting the children during Passover. Resolution of the resulting dispute required a court order. Thus, there was evidence that the parties had failed to cooperate with respect to the religion and education of the children and that the mother had attempted to prevent the father from visiting the children. *See infra* p. 501–502 (stating importance to children of significant contact with both parents). Accordingly, the chancellor did not apply the wrong standard.

> Several criteria must be considered in arriving at [the best interest of the child], including, *inter alia,* the fitness of the parents, character and reputation of the parties, desire of the natural parents and agreement between the parties, potentiality of maintaining natural family relations, preference of the child, material opportunities affecting the future life of the child, age, health and sex of the child, residences of the parents and opportunity for visitation, length of separation from the natural parents, and prior voluntary abandonment or surrender.

*Shunk v. Walker,* 87 Md.App. 389, 397, 589 A.2d 1303 (1991).

The chancellor has broad discretion in making a custody decision.

> We will not set aside factual findings made by the chancellor unless clearly erroneous, and we will not interfere with a decision regarding custody that is founded upon

sound legal principles unless there is a clear showing that the chancellor abused his discretion.

*McCready*, 323 Md. at 484, 593 A.2d 1128.

The record supports the chancellor's findings. For instance, it was universally agreed that the children had a close relationship and strong bonds with both their mother and father. In individual interviews with the chancellor in chambers (with only a court reporter present), each of the children indicated that there was a dearth of activities for them in and around Sam Bienenfeld's apartment. There was testimony from several sources, including the mother and Bienenfeld, that Bienenfeld had been involved in a number of violent altercations with Reider and Shannon. The evidence also showed that the children had lived in the Sandee Road house for many years and had many friends and activities there.

Also supported by the record were the chancellor's findings that the parties previously agreed that the children would be exposed to both the Orthodox Jewish and Episcopal faiths and that the mother had attempted to restrict the children's access to the father because of her religious views. The consensual custody agreement recited and consented to during the hearing before the master provided that "the parties will cooperate with each other with respect to religious observances of each other and those of the children." [6] The mother testified that the father had agreed at the time of the conversion not to take the children to church, and indicated that she regarded his doing so as an interference with her prerogative to inculcate religious beliefs in the children. She also testified that she believed that the father was not adequately supportive of the children's involvement with Orthodox Judaism. Additionally, the evidence showed that the mother had sought to deny

---

6. The Court of Appeals has held that "this type of agreement in regard to the religious upbringing of a child is a desirable one which should be encouraged." *Wagshal v. Wagshal,* 249 Md. 143, 149, 238 A.2d 903 (1968).

the father visitation rights on occasions when she felt that such visitation would conflict with the children's religious observances.

■ The chancellor concluded that, under the circumstances, the children's interests would best be served by awarding the father physical and legal custody, while at the same time ensuring extensive continuing contact with the mother. We cannot say that the chancellor abused his discretion in reaching this conclusion. The chancellor recognized the desirability of maintaining stability in the children's lives and repeatedly stressed the need for stability as a factor in his decision. Obviously, continued custody in the mother, who until then had been the children's primary caretaker, would have provided a form of stability for the children. The issue of stability may cut different ways in a given case, however. *Domingues*, 323 Md. at 502, 593 A.2d 1133. In the instant case, there was evidence that the mother intended to uproot the children from a very stable, familiar environment and settle them in an unfamiliar and somewhat less desirable situation. There was evidence that, as a result of the mother's remarriage, the children would be living with a man with whom they had significant difficulties. There was also evidence that the children's ties to the father would be threatened if the mother were given custody. The importance to children of significant contact with both parents is well recognized. *See id.* ("How valuable the mature guiding hand and love of a second parent may be to a child is taught by life itself") (citations omitted). *See also In re Marriage of Hadeen,* 27 Wash.App. 566, 619 P.2d 374, 382 (1980) ("to deny to the child an opportunity to know, associate with, love and be loved by either parent, may be a more serious ill than to refuse it in some part those things which money can buy") (citations omitted). Clearly, then, the decision of which party should be awarded custody was neither easy nor clearcut.

We have observed that "there is no such thing as a simple custody case," and that "a judge agonizes more about reaching the right result in a contested custody issue than

about any other type of decision...." *Montgomery County v. Sanders*, 38 Md.App. 406, 414, 381 A.2d 1154 (1978) (citations omitted). This is especially so in a case such as the one before us, where the chancellor did not find that either parent was unfit. "At the bottom line, what is in the child's best interest equals the fact finder's best guess." *Id.* at 419, 381 A.2d 1154. The chancellor had the opportunity to observe personally the witnesses, and his judgment of their credibility is entitled to deference. *See id.* ("we must afford great weight to the Chancellor's opportunity to see and hear the witnesses, ... inasmuch as we are supplied with only the transcribed testimony") (citations omitted). We are not free to substitute our judgment for that of the chancellor. The determination of the best interests of the children was for him to make in the exercise of his discretion.

## II.

*Did the chancellor abuse his discretion in considering evidence of the views and practices of the mother regarding the children's religious upbringing in making his custody determination?*

The mother contends that the chancellor abused his discretion by giving consideration to evidence of her views and practices regarding the children's religious upbringing in making his custody determination. We reject this contention.

It is well established that child custody determinations must be made by careful examination of facts on a case-by-case basis. *See Montgomery County v. Sanders*, 38 Md.App. 406, 419, 381 A.2d 1154 (1978) (best interests standard varies with each individual case). Courts are not limited or bound to consideration of any exhaustive list of factors in applying the best interests standard, *see id.* at 420, 381 A.2d 1154, but possess a wide discretion concomitant with their "plenary authority to determine any question concerning the welfare of children within their jurisdic-

tion[.]" `Kennedy v. Kennedy,` 55 Md.App. 299, 310, 462 A.2d 1208 (1983). This authority clearly empowers courts applying the best interests standard to consider any evidence which bears on a child's physical or emotional well-being.

Nevertheless, there are clear boundaries to the authority of courts in the matter of religion. The first amendment of the Constitution of the United States,[7] which is made applicable to the states through the fourteenth amendment, *Mercy Hospital v. Jackson,* 62 Md.App. 409, 415 n. 6, 489 A.2d 1130 (1985), *vacated as moot,* 306 Md. 556, 510 A.2d 562 (1986),[8] prevents the government from preferring one religion over another and safeguards the free exercise of religion. *Davis v. State,* 294 Md. 370, 379, 451 A.2d 107 (1982); *Hopkins v. State,* 193 Md. 489, 496, 69 A.2d 456 (1949). "Freedom of religion means the right to pursue one's religious beliefs without interference from any other religion, non-religion or the government." *Mercy Hospital,* 62 Md.App. at 414, 489 A.2d 1130. It has been recognized that freedom of religion includes the right to direct the religious upbringing of one's children. *Wisconsin v. Yoder,* 406 U.S. 205, 232, 92 S.Ct. 1526, 1541, 32 L.Ed.2d 15 (1972); *Thomas v. Alleghany County Bd. of Education,* 51 Md. App. 312, 316, 443 A.2d 622 (1982).

The authority to make custody determinations does not give courts license to engage in constitutionally prohibited activities. Consequently, courts may not weigh the merits of different religions or different religious upbringings—including nonreligion—in resolving custody disputes.[9] *See,*

---

**7.** The first amendment of the Constitution of the United States provides, in part, that:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]

**8.** *See also* Maryland Constitution, Declaration of Rights, Article 36.

**9.** The wisdom of this principle was explained eloquently in *Quiner v. Quiner,* 59 Cal.Rptr. 503, 516–18 (Cal.Ct.App.1967):

*e.g., Levitsky v. Levitsky,* 231 Md. 388, 398, 190 A.2d 621 (1963) (recognizing that "the fact that a parent teaches a child religious doctrines which are at variance with those of the majority is not a ground for a change of custody"); *Sanders,* 38 Md.App. at 416 n. 10, 381 A.2d 1154 ("pronouncement that athiests or persons with 'irreligious principles' are unfit parents is without the ambit of the First Amendment.").

In *Levitsky,* 231 Md. at 392, 190 A.2d 621, the Court of Appeals considered the following question:

> [W]hether or not the mother should be permitted to have custody of these children in view of her refusal, because of her religious beliefs, to permit her son to have blood transfusions when competent medical doctors deemed such treatment essential to save his life, and because of her announced intention to adhere to the same view, if such a situation should again arise with regard to any of the children.

The Court held that, under such circumstances, the mother's religious views might bar her from having custody of the children. In so holding, the Court stated as follows:

> If the mother's religious views did not involve the risk of most serious adverse consequences, we might have a very different situation. There are a number of cases holding that the fact that a parent teaches a child reli-

---

Precisely because a court cannot *know* one way or another, with any degree of certainty, the proper or sure road to personal security and happiness or to religious salvation, which latter to untold millions is their primary and ultimate best interest, evaluation of religious teaching and training and its projected as distinguished from its immediate effect (psychologists and psychiatrists to the contrary notwithstanding) upon the physical, mental and emotional well-being of a child, must be forcibly kept from judicial determinations. Numerous profound thinkers have fixed convictions that *all* religion is bad, particularly so in the rearing of children. If a court has the right to weigh the religious beliefs or lack of them of one parent against those of the other, for the purpose of making a precise conclusion as to which one is for the best interests of a child, we open a Pandora's box which can never be closed. By their very nature, religious evaluations are subject to question, disbelief, and difference of opinion....

gious doctrines which are at variance with those of the majority is not a ground for a change of custody....

Where, however, there is a serious danger to the life or health of a child as a result of the religious views of a parent, the rule seems to be recognized in other jurisdictions which have considered the question that this may bar custody by the parent holding such views, or may call for protection against such views by an appropriate order. An annotation on 'Religion as factor in awarding custody of a child,' in 66 A.L.R.2d 1410, states at p. 1430: ' * * * where the religious practices of the parent having custody threaten the child's temporal welfare the courts may interfere to protect the child by a change of custody or other appropriate order.' ... *Battaglia v. Battaglia,* [9 Misc.2d 1067], 172 N.Y.S.2d 361 (1958), is a case strikingly similar to the instant case, except that in that case there was only the possibility of the happening of such an incident as that which actually occurred here. The Supreme Court of New York (Special Term, Albany County) awarded custody to the father and said: 'Petitioner [mother], of course, enjoys her constitutional right to freedom of religion and may practice the religious faith of her choice without interference. She has not, however, the right to impose upon an innocent child the hazards to it flowing from her own religious convictions. The welfare of the child is paramount. If medical science requires a blood transfusion to preserve the child's life, the child should not be deprived of life because the mother's religious persuasion opposes such transfusion. The child has a right to survival and a chance to live and the court has a duty to extend its protecting arm to the child.' *Id.* at 398–99, 190 A.2d 621.

Three years after its decision in *Levitsky,* the Court of Appeals, citing *Levitsky,* held that a trial court could consider "the added subconscious strain on a six year old boy of being brought up in a religion different from that of his father and sisters, whatever the religions involved may be." *Daubert v. Daubert,* 239 Md. 303, 309–10, 211 A.2d 323

(1965). The evidence in *Daubert* showed that the father and the sisters were Catholics, while the mother was Protestant. Unlike in *Levitsky*, however, the Court in *Daubert* did not discuss the constitutional implications of a court considering the religious views of parties seeking custody in a best interests analysis. Moreover, there was no evidence in *Daubert* that the difference between the parties' religious faiths had a bearing on the child's physical or emotional well-being, let alone "the risk of most serious adverse consequences" involved in *Levitsky*. In the absence of such discussion or evidence, we do not find *Daubert* a particularly helpful or persuasive guide in the case *sub judice*.

█ It is clear from the foregoing discussion that, while there are clear constitutional boundaries to the authority of a court to consider religion in a custody proceeding, "a court ... must not blind itself to evidence of religious beliefs or practices of a party seeking custody which may impair or endanger the child's welfare." *In re Marriage of Short*, 698 P.2d 1310, 1313 (Colo.1985). To ignore such evidence would be a dereliction of the duty of courts to "monitor the welfare of children in their jurisdiction and promote the children's best interests." *Kennedy*, 55 Md. App. at 310, 462 A.2d 1208. Therefore, based upon the Court of Appeals' ruling in *Levitsky*, we hold that a court in a custody proceeding may consider evidence of the religious views or practices of a party seeking custody, along with other factors impacting upon the child's welfare, to the extent that such views or practices are demonstrated to bear upon the physical or emotional welfare of the child.[10] Absent such a demonstration, courts have no business treading on the constitutionally sensitive ground of religion.

---

10. We note that many state courts addressing the issue have concluded that evidence of the religious views or practices of a party seeking custody may be considered in a child custody determination where such views are demonstrated to pose a threat to the child's secular well-being. *See* Beschle, God Bless the Child?: The Use of Religion as a Factor in Child Custody and Adoption Proceedings, 58 Fordham L.Rev. 398 (1989) (and cases cited therein).

In the instant case, the chancellor found that the mother had attempted to restrict the children's access to the father because of her views regarding their religious upbringing. As we have already stated, the importance to children of significant contact with both parents is well established. *Domingues v. Johnson*, 323 Md. 486, 502, 593 A.2d 1133 (1991). *See also In re Marriage of Hadeen*, 27 Wash.App. 566, 619 P.2d 374, 382 (1980). The chancellor stressed his own recognition of the importance of contact with both parents, stating that "it is in the best interests of the children for them to be involved with both parents, both mother and father, to the greatest extent possible." To the extent that her fidelity to her views regarding the children's religious upbringing posed a threat to the children's relationship with their father, the mother's views had a bearing upon the children's emotional well-being. The chancellor did not focus exclusively upon the mother's views regarding the religious upbringing of the children, but rather examined the totality of the circumstances in the case. *See Sanders*, 38 Md.App. at 420–21, 381 A.2d 1154 ("The court should examine the totality of the situation in the alternative environments and avoid focusing on any single factor"). Therefore, we hold that the chancellor did not abuse his discretion by considering evidence of the religious views of the mother in making his custody determination.

The mother also contends that the chancellor abused his discretion by giving weight to the children's religious preferences, as expressed in their personal interviews with him in chambers. As we read the record and the findings, the chancellor did not give weight to the children's religious preferences, but rather discounted the children's religious preferences because the children were too young to choose a religion. Assuming the chancellor had given weight to such preferences, we cannot say that it necessarily would have been improper. *See Ross v. Pick*, 199 Md. 341, 353, 86 A.2d 463 (1952) ("in determining in a contest for custody what will promote the best interests of the child, the child's

own wishes may be consulted and given weight if he is of sufficient age and capacity to form a rational judgment.").

## III.

*Did the chancellor's decision infringe upon the mother's right to free exercise of religion?*

We turn next to the mother's contention that the chancellor, in making his custody decision, infringed upon her right to free exercise of religion under the first amendment of the Constitution of the United States. *See supra* n. 7. We find this contention to be without merit.

> The free exercise clause bars 'government regulation of religious beliefs as such, or interference with the dissemination of religious ideas.' To meet the constitutional mandates established by the free exercise clause, the application of a rule either (1) must not interfere with, burden, or deny the free exercise of a legitimate religious belief or (2) must be justified by a state interest of sufficient magnitude to override the interest claiming protection under the free exercise clause.

*Thomas v. Alleghany County Bd. of Education,* 51 Md. App. 312, 316, 443 A.2d 622 (1982). *See also Mercy Hospital v. Jackson,* 62 Md.App. 409, 415, 489 A.2d 1130 (1985), *vacated as moot,* 306 Md. 556, 510 A.2d 562 (1986). As we have already indicated, freedom of religion includes the right to direct the religious upbringing of one's children. *Wisconsin v. Yoder,* 406 U.S. 205, 232, 92 S.Ct. 1526, 1541, 32 L.Ed.2d 15 (1972); *Thomas,* 51 Md.App. at 316, 443 A.2d 622.

■ We are not convinced that the chancellor in the instant case interfered with the mother's right to free exercise of religion. This is not a case in which limitations were placed upon a parent's religious activities with children during visitation periods. *See Kennedy,* 55 Md.App. at 311, 462 A.2d 1208 (stating that "[i]f such a decree would serve the best interests of the involved children, a chancellor may require a parent to provide specific religious training."). The mother in the case before us retained unlimited

prerogative to direct the children's religious upbringing during visitation periods. Moreover, the chancellor specifically tailored the mother's visitation rights to coincide with particular religious holidays, so that her children would be able to fulfill the religious obligations imposed by her faith.[11]

Even assuming that the chancellor did interfere with the mother's right to free exercise of religion by considering evidence of her views regarding the religious upbringing of the children in making his custody determination, we would conclude that such interference was justified. As we have already stated, courts may not ignore evidence of a parent's religious views or practices which endanger the secular welfare of the child. While a parent has the right to inculcate religious beliefs in a child, that right is not immune from interference where, as here, there is evidence that the chosen method of such inculcation poses a threat to the child's secular well-being.

> If the court must choose between meaningful visitation and the full benefits of a desired program of religious indoctrination, the religious indoctrination must yield to the greater interest in preserving the parent-child relationship.

*Zummo v. Zummo,* 394 Pa.Super. 30, 574 A.2d 1130, 1158 (1990).

## IV.

*Did the chancellor abuse his discretion in modifying the 29 June 1989 custody order?*

We now address the challenges raised by the mother to the chancellor's modification of the 29 June 1989

---

**11.** The mother complains that the chancellor did not cover every religious holiday. The chancellor's failure to do so was evidently dictated by competing demands on the children's time. The exact nature of visitation rights is entrusted to the chancellor, and we will not disturb it on appeal absent a clear abuse of discretion. *See McCready v. McCready,* 323 Md. 476, 484, 593 A.2d 1128 (1991). We find no such abuse of discretion in the instant case.

custody order. Specifically, the mother contends that the chancellor abused his discretion in modifying the order with respect to (1) Reider's attendance at Beth Tfiloh, (2) the mother's visitation rights with Reider on religious holidays, and (3) psychological counselling for Reider, the mother and the father.

> [T]he equity courts in Maryland have plenary authority to determine any question concerning the welfare of children within their jurisdiction, and such power does not terminate once the initial custody, support and visitation rights have been established.

*Kennedy,* 55 Md.App. at 310, 462 A.2d 1208. *See also Daubert v. Daubert,* 239 Md. 303, 310, 211 A.2d 323 (1965) (observing that retention of jurisdiction in custody matters "is a proper recognition of the uncertainties of life."). We will not interfere with a decision modifying a custody decree unless there is a clear abuse of discretion. *McCready v. McCready,* 323 Md. 476, 484, 593 A.2d 1128 (1991).

The record supports the chancellor's findings regarding the changes that had occurred with respect to Reider's attendance at Beth Tfiloh and the significance of those changes. The evidence showed that Beth Tfiloh had so far not evaluated the special educational needs Reider might have at the middle school level, and that it had no concrete plans to do so. The evidence also showed that a public school would be under a legal obligation to conduct such an evaluation.

Additionally, the evidence showed that, after the trial on the merits, Reider's teachers at Beth Tfiloh had noticed him exhibiting increased symptoms of anxiety, which included facial tics and writing and verbalizing themes of sadness and worry about family problems.

The school referred him to Dr. O'Callaghan, who met with him on four separate occasions. In Dr. O'Callaghan's opinion, Reider was exhibiting signs of anxiety. This anxiety, according to Dr. O'Callaghan, stemmed in part from his

growing need to develop a sense of his own identity. She indicated that he might profit from increased control over important decisions in his life. Dr. O'Callaghan also opined that:

> [Reider] sees himself as different from many other children in his class, and the area of differences he identifies is that many of the boys his age are very committed to—very clearly committed to a lifestyle that is less conflicted than his, and that it's more committed to a Jewish religious observance.

Dr. O'Callaghan indicated that this perceived difference contributed to Reider's anxiety, and suggested that Reider might benefit if he were allowed to attend a school where he did not perceive himself to be unique or unusual in this respect. The chancellor concluded that, under the circumstances, the best interests of Reider would not be served by requiring that he continue to attend Beth Tfiloh. As there was competent evidence that allowing Reider to transfer would promote his welfare both academically and emotionally, we hold that the chancellor did not abuse his discretion by so concluding.[12] The mother does not raise a challenge to the chancellor's consideration of the religious differences between Reider and his peers at Beth Tfiloh in reaching his conclusion. We note, however, that it was proper for the chancellor to do so, since there was a demonstration that those differences had a bearing on Reider's emotional well-being.

The chancellor also modified the custody order to provide that Reider could miss no more than one school day

---

**12.** The mother contends that in amending the wording of the modified order from "Reider may be enrolled in such public school as is appropriate for him" to "the Father shall decide where Reider shall attend school," the chancellor incorrectly relied on the holding of *Ruppert v. Fish,* 84 Md.App. 665, 581 A.2d 828 (1990). The mother refers us to nothing in the record to support the conclusion that the chancellor even considered *Ruppert.* Accordingly, we do not address the contention. *See Shell Oil Co. v. Ryckman,* 43 Md.App. 1, 4, 403 A.2d 379 (1979) (court may choose not to address contention without evidentiary support).

in connection with religious observances for each of four Jewish holidays for which the chancellor had specifically provided the mother with visitation rights. The mother argues that, in doing so, the chancellor made a constitutionally prohibited value judgment as to the importance of specific religious holidays. We disagree. The chancellor decided that Reider's best interests would be furthered by not missing too much school. The amended order provided that: "except as herein provided, public school attendance shall take precedence over ... religious holidays[.]" We do not think that the chancellor ranged beyond the constitutional boundaries of his authority in so deciding.

■ The mother next contends that the chancellor abused his discretion by requiring such psychological counselling for Reider, the mother and the father as might be recommended by Dr. O'Callaghan, and by ordering that the costs for such counselling be divided equally between the mother and the father. We are not so persuaded. Dr. O'Callaghan had already met with Reider on four separate occasions and with the parties both individually and together. Dr. O'Callaghan testified that the increased symptoms of anxiety Reider had exhibited since the trial on the merits were due in part to the ongoing conflict between his parents. Dr. O'Callaghan also testified that Reider had asked her "to meet with both of his parents, and he requested that we all have a joint meeting with him present, to discuss some of his concerns, so that he could voice those to his parents with me there." [13] Under the circumstances, it was within the chancellor's discretion to order such counselling as Dr. O'Callaghan might recommend and to order that the costs be divided equally between the parties.[14]

---

**13.** The mother herself testified that there had been an "improvement" in Reider since he had started seeing Dr. O'Callaghan and that she "hoped" he would continue to see her.

**14.** The mother attempts to characterize the chancellor's order that she pay half the costs of such counselling as an improper increase in child support. As the order does not pertain solely to Reider, however, but

## V.

*Did the chancellor abuse his discretion in denying the mother's motion for contempt?*

The mother's final contention merits little discussion. She contends that the chancellor abused his discretion in denying her request that the father be held in contempt for (1) failing to pay one-half the cost of a mathematics tutor for Shannon, as allegedly required by the 29 June 1989 order, and (2) seeking to enroll Reider in a public school contrary to the 29 June 1989 order. The chancellor concluded (1) that the tutoring for which the father had refused to pay was not tutoring recommended by the school, as required by the order,[15] and (2) that the father's contacts with Ridgely Middle School prior to his filing of the motion for permission to enroll Reider there merely represented the father's good faith efforts to apprise himself of the educational opportunities available to Reider. Accordingly, the chancellor declined to hold the father in contempt. The decision to hold an individual in contempt is within the sound discretion of the trial court and will only be reversed upon a clear showing of abuse of discretion. *See In re Ann M.*, 309 Md. 564, 572, 525 A.2d 1054 (1987). There is no such showing in the instant case.

JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.

---

to the parents as well, we do not think it can be fairly characterized as an increase in child support. Accordingly, *Woodham v. Woodham*, 235 Md. 356, 201 A.2d 674 (1964), which the mother relies upon for the proposition that the chancellor did not have the authority to order an increase in child support *sua sponte*, is inapposite, and the provisions of Md.Fam.Law Code Ann. § 12–201 *et seq.* (1991 Repl. Vol.) are inapplicable.

15. The chancellor concluded that the school's indication on Shannon's report card that Shannon "may benefit from summer tutoring" did not constitute the type of recommendation contemplated by the order, but merely a general suggestion that could apply to any student.