*In Re: K. Y-B.*, No. 3150, Sept. Term, 2018.  Opinion by Arthur, J.

**SHELTER CARE FOR ALLEGED CINA—WAIVER OF OBJECTION**

A parent waives the right to contest an earlier order for shelter care of the parent's child by requesting or consenting to shelter care at a later hearing.

**HEALTH AND DISEASE PREVENTION—IMMUNIZATION OF MINORS**

Section 18-4A-03 of the Health-General Article authorizes certain persons to consent to the immunization of a minor if a parent is unavailable, subject to certain conditions.  The provisions of this statute do not apply when a parent appears in person at a juvenile court proceeding and asserts an objection to immunization of the parent's child.

**SHELTER CARE FOR ALLEGED CINA—CONSENT TO IMMUNIZATIONS**

The juvenile court did not abuse its discretion in granting a local department of social services the authority to allow a two-week-old child placed in shelter care to receive routine vaccinations, despite a mother's religious objection to vaccinations.

In making decisions regarding placement of children outside the parental home, it is appropriate for a juvenile court to evaluate whether a parent's religious beliefs pose a serious danger to the child's life or health or impair or endanger the child's welfare. When making such a decision, the court may consider well-known information that infants are acutely at risk of contracting infectious diseases and other serious illnesses unless they receive vaccinations recommended by authorities in pediatric medicine.  In light of these serious risks, as well as the effectiveness of preventive immunizations, the court may properly conclude that the State's interest in protecting the health of a child outweighs a parent's belief that vaccinations contravene the parent's religion.

Circuit Court for Baltimore City
Petition No. 819004005

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 3150

September Term, 2018

_____

IN RE: K.Y-B.

_____

Kehoe,
Arthur,
Reed,

JJ.

_____

Opinion by Arthur, J.

_____

Filed: August 30, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This appeal challenges an order of shelter care for K.Y.-B. (the "Child"), who was placed into the custody and care of the Baltimore City Department of Social Services (the "Department") on January 4, 2019, two days after his birth. Through a series of subsequent orders, he remains in shelter care more than seven months later, pending the adjudication of the Department's petition to have the Circuit Court for Baltimore City, sitting as a juvenile court, declare him to be a child in need of assistance ("CINA").

Appealing a shelter care order entered on January 22, 2019, the Child's mother, appellant N.Y.-F. ("Mother"), raises the following questions:

1. Did the court err in awarding shelter care of K. Y.-B. to the Baltimore City Department of Social Services?

2. Did the court err by granting the Department's request to consent to immunizations for K. Y.-B. over the religious objections of his mother?

The Child moves to dismiss this appeal, arguing that it has been mooted by subsequent orders resulting from proceedings at which Mother allegedly waived her objections. In response, Mother concedes that she consented to shelter care at a hearing on April 4, 2019, but insists that she has maintained her religious objection to vaccinations from the outset of these proceedings and that she renewed her objection to shelter care at the latest shelter care hearing on May 17, 2019.

We conclude that Mother has waived her right to contest the shelter care order by consenting to shelter care at a later hearing, but that the order regarding vaccinations remains ripe for a decision. We shall also conclude that the juvenile court did not err or abuse its discretion in authorizing the Department to obtain vaccinations for the Child. In

doing so, we shall clarify the standards governing a parent's religious objection to vaccination in the context of a shelter care proceeding.

**STANDARDS GOVERNING CINA AND SHELTER CARE PROCEEDINGS**

Our discussion of the record and issues raised by the parties will be aided by a preliminary review of the law protecting a child for whom the Department has sought assistance.

A CINA is "a child who requires court intervention because: (1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and (2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs." Md. Code (1974, 2013 Repl. Vol., 2018 Supp.), § 3-801(f), (g) of the Courts & Judicial Proceedings Article ("CJP"). In *In re O.P.*, 240 Md. App. 518 (2019), *cert. granted*, ___ Md. ___ (July 12, 2019), this Court summarized the statutory scheme governing CINA proceedings:

> Subtitle 8 [of the Courts and Judicial Proceedings Article] establishes a comprehensive statutory scheme to govern proceedings when a child is alleged to be a CINA. The statute gives "exclusive original jurisdiction" to a juvenile court over proceedings arising from CINA petitions, *id*. § 3-803(a)(2), and establishes, among other things, the scope of the court's jurisdiction over children, venue for proceedings, assignment of judges, the appointment and authority of juvenile magistrates, the review of decisions or recommendations of magistrates to the juvenile court, the confidentiality of proceedings, the scope of a local department's obligation to make reasonable efforts to reunify children and parents, and the State's obligation to provide counsel to represent children, as well as indigent parents and guardians of an alleged CINA, in CINA proceedings, *id*. §§ 3-804, 3-805, 3-806, 3-807, 3-810, 3-812, & 3-813.

> A local department of social services is required to file a CINA petition if, after receiving "a complaint from a person or agency," "it concludes that the court has jurisdiction over the matter and that the filing

of a petition is in the best interests of the child." *Id*. § 3-809(a).  "A CINA petition . . . shall allege that a child is in need of assistance and shall set forth in clear and simple language the facts supporting that allegation."  *Id*. § 3-811(a)(1).  Once a CINA petition is filed, a juvenile court "shall hold an adjudicatory hearing[,]" *id*. § 3-817(a), for the purpose of "determin[ing] whether the allegations in the petition, other than the allegation that the child requires the court's intervention, are true[,]" *id*. § 3-801(c).  At the adjudicatory hearing, the rules of evidence apply and the allegations of the petition must "be proved by a preponderance of the evidence."  *Id*. § 3-817(b), (c).

Following an adjudicatory hearing, the juvenile court must "hold a separate disposition hearing," either "on the same day as the adjudicatory hearing" or later.  *Id*. § 3-819(a).  With respect to a child who is alleged to be a CINA arising from abuse or neglect, the court's disposition may entail (1) finding that the child is not a CINA and terminating the case, (2) finding that the child is not a CINA and awarding custody to a noncustodial parent, or (3) finding that the child is a CINA and making a custody determination from among various options.  *See generally id.* § 3-819.

*Id*. at 547-49.

Shelter care proceedings occur under a separate but related statutory scheme, which authorizes removal of a child alleged or adjudicated to be a CINA from his parents' custody in an emergency:

Section 3-815 of the Courts and Judicial Proceedings Article authorizes a local department that believes a child may be a CINA to place the child in emergency shelter care under certain circumstances.  As explained further below, shelter care is not a necessary stage in a CINA proceeding but instead is a parallel proceeding to provide interim protection for a child pending completion of the adjudicatory hearing and disposition. Subsection (a) of § 3-815 provides the general authorization for emergency shelter care: "In accordance with regulations adopted by the Department of Human Services, a local department may authorize shelter care for a child who may be in need of assistance and has been taken into custody under this subtitle."  Subsection (b) then establishes the following parameters:

> (b) **A local department may place a child in emergency shelter care before a hearing if:**

3

**(1) Placement is required to protect the child from serious immediate danger;**

**(2) There is no parent, guardian, custodian, relative, or other person able to provide supervision; and**

**(3) (i) 1. The child's continued placement in the child's home is contrary to the welfare of the child; and**

**2. Because of an alleged emergency situation, removal from the home is reasonable under the circumstances to provide for the safety of the child; or**

**(ii) 1. Reasonable efforts have been made but have been unsuccessful in preventing or eliminating the need for removal from the child's home; and**

**2. As appropriate, reasonable efforts are being made to return the child to the child's home.**

Following placement of a child in emergency shelter care, "the local department shall immediately file a petition to authorize continued shelter care." *Id.* § 3-815(c)(1). The court is required to "hold a shelter care hearing on the petition before disposition to determine whether the temporary placement of the child outside of the home is warranted." *Id.* § 3-815(c)(2)(i). Absent good cause, the hearing must "be held not later than the next day on which the circuit court is in session." *Id.* § 3-815(c)(2)(ii).

. . . .

Subsection (d) provides the criteria for the circuit court to use in determining whether to authorize continued shelter care:

**(d) A court may continue shelter care beyond emergency shelter care only if the court finds that:**

**(1) Return of the child to the child's home is contrary to the safety and welfare of the child; and**

**(2)(i) Removal of the child from the child's home is necessary due to an alleged emergency situation and in order to provide for the safety of the child; or**

4

**(ii) Reasonable efforts were made but were unsuccessful in preventing or eliminating the need for removal of the child from the home.**

The duration of a term of shelter care is expressly limited: "A court may not order shelter care for more than 30 days except that shelter care may be extended for up to an additional 30 days if the court finds after a hearing held as part of an adjudication that continued shelter care is needed to provide for the safety of the child." *Id*. § 3-815(c)(4).

*Id.* at 549-51 (emphasis added).

## BACKGROUND

On January 2, 2019, Mother gave birth to the Child, her eighth, at a Baltimore hospital. On January 4, 2019, before the Child was discharged from the hospital, the Department filed a CINA petition in which it sought immediate emergency shelter care for the Child. The Child was placed into shelter care.

In the initial petition, the Department alleged that five of Mother's seven living children had been found to be CINA and had been committed to the Department. The petition made the following allegations about Mother:

> Mother was not cooperative with hospital staff at Mercy Medical Center regarding [the Child's] medical care. Mother refused referrals for services and was not forth-coming [sic] with information about her children in [Department] custody. She stated to the hospital that her mother was responsible for the children being removed because her mother used witchcraft. Mother did not begin prenatal care until she was in her second trimester, citing religious reasons. Later, [M]other stated that the reason she waited so long to get prenatal care was that she did not want to go out in the community so her mother would not see her pregnant and take this baby away, too.

The Department alleged that "Father is unable to provide adequate care and protection for the [Child]." It explained that Father wanted the Child's paternal

5

grandmother to be present while he was not at home, but that Mother had said that the grandmother "was not welcome in the home." Mother had also said that she and Father were "in the process of divorcing."

Mother's last child, who was born in July 2017, had died of "unknown causes" at the age of three months. Another child had been hospitalized in 2016 for failure to thrive because Mother and Father had not ensured that he would receive treatment for congenital orthopedic deformities and had not fed him properly. According to the petition, Mother and Father had a long history of abuse and neglect of their other children, including failing to ensure that the children were up to date on their immunizations and failing to obtain routine medical care.

The petition went on to allege that Mother had a history of mental health issues. She had been diagnosed with bipolar disorder and depression, but disputed the diagnoses. She was not taking any medications, but she did not provide the Department with medical releases to confirm that no medications had been prescribed for her.

Finally, according to the petition, both Mother and Father had faced criminal charges for child abuse. On July 14, 2018, while she was pregnant with the Child, Mother was charged with first- and second-degree child abuse, first- and second-degree assault, and using a dangerous weapon with intent to injure a child; she received probation before judgment. In 2010 Father was convicted of second-degree child abuse.

After a hearing on January 7, 2019, a family magistrate recommended that limited guardianship be granted to the Department, based on her conclusion that the Child's residence in the home of Mother and Father would be contrary to his welfare. In support

6

of that conclusion, the magistrate found that Mother and Father had a "lengthy history of abuse and neglect," that Mother had recently been charged with abusing a stepson and received probation, and that Father has a conviction for child abuse in 2010. The magistrate recommended that the Department be granted "authority to consent to the provision of routine and evaluative medical care," but not to consent to immunizations, "as mother's religious beliefs dictate against immunizations." On the same day, the juvenile court adopted the magistrate's recommendations, signing a shelter care order implementing them.

On January 8, 2019, Mother moved for immediate review of the January 7, 2019, order placing the Child in shelter care. On the following day, the Department also moved for immediate review. In its motion, the Department objected to the prohibition on "consenting to routine vaccinations as part of the grant of limited guardianship."

On January 16, 2019, the juvenile court conducted a hearing on the motions for immediate review. The court took judicial notice of orders in other CINA cases, which showed that Mother's last child had died at three months in circumstances indicating neglect by Father and that another child been hospitalized at five months for failure to thrive because Mother and Father had substituted powdered milk for infant formula. On the basis of the undisputed evidence before it, the court found that both Mother and Father "have a lengthy history of abuse and neglect"; that Mother had recently received probation for abusing her stepson; and that Father had been convicted of child abuse in 2010. Finally, the court found that the Department had attempted to develop a safety plan to avert the need for shelter care, but had been unable to do so.

7

On the basis of its findings at the hearing on January 16, 2019, the court ordered the continuation of shelter care and granted the Department the authority "to allow the [Child] to receive routine vaccinations," subject to a stay pending appeal. In granting the Department the authority to allow the Child to receive vaccinations despite Mother's objections, the court cited "the State's interest in the public health and the secular welfare of the [Child.]" The Court appears to have signed the order on January 22, 2019, and the order was entered on the docket on that date. Mother noted an appeal.[1]

The proceedings continued. On January 25, 2019, the Department filed an amended petition in which it cited four previous incidents in which Mother or Father had been "indicated" for child abuse or neglect:[2] in June 2011 Father was indicated for physical abuse after one of his children suffered a broken femur; in December 2016 Mother and Father were indicated for neglect because of the child who failed to thrive as a result of the neglect of his medical needs; in April 2018 Father was indicated for neglect in connection with the death of Mother's seventh child; and in October 2018

---

[1] Mother noted her appeal before the court's order was entered on the docket. Nonetheless, the appeal was not premature: under Rule 8-602(f), "[a] notice of appeal filed after the announcement or signing by the trial court of a ruling, decision, order, or judgment but before entry of the ruling, decision, order, or judgment on the docket shall be treated as filed on the same day as, but after, the entry on the docket."

[2] A finding of abuse or neglect is "indicated" when "there is credible evidence, which has not been satisfactorily refuted, that abuse, neglect, or sexual abuse did occur." Md. Code (1984, 2012 Repl. Vol.), § 5-701(m) of the Family Law Article.

Mother was indicated for physical abuse for beating one of Father's children with an extension cord.[3]

On February 21, 2019, a CINA adjudicatory hearing began before a family magistrate, but it did not conclude. The magistrate continued the adjudication until April 4, 2019. Because the shelter care order was to expire before the hearing would recommence, the magistrate recommended that the Child remain in shelter care and that the Department continue to have limited guardianship, including "the authority to consent to the provision of routine and evaluative medical care[.]" On March 1, 2019, the court signed an order implementing the magistrate's recommendations and extending the duration of shelter care.

When the CINA adjudicatory hearing recommenced before the magistrate on April 4, 2019, Mother was not present. Her attorney requested a postponement, explaining that she had been hospitalized the day before, in the psychiatric unit of a local hospital. The magistrate recommended a postponement until May 17, 2019, with "[a]ll previous Orders of Shelter Care [to] continue." The court signed an order approving the recommendation and extending the duration of shelter care for a second time on April 12, 2019. The order recited that Mother's attorney had requested shelter care.

On May 17, 2019, the date scheduled for the recommencement of the CINA adjudication hearing, counsel for the Department was sick, and Father had been

---

[3] The June 2011 incident is evidently associated with Father's conviction for child abuse. The October 2018 incident is associated with the assault and abuse charges for which Mother received probation before judgment.

hospitalized.  The magistrate postponed the hearing again, this time until August 16,

2019.  She then conducted another shelter care review hearing.  Over Mother's objection,

the magistrate recommended the continuation of shelter care, with the Department

retaining the authority to consent to "routine medical care" for the Child.  On June 17,

2019, the court signed an order adopting the magistrate's recommendations and

extending the duration of shelter care for a third time.  Meanwhile, Mother had noted a

second appeal.

On August 16, 2019, the court ordered that the contested CINA adjudicatory

hearing be continued until September 20, 2019.  By the time the adjudication hearing

resumes, the Child will have been in shelter care for 260 of the 262 days of his life.[4]

---

[4] "[T]he duration of a term of shelter care is expressly limited[.]"  *In re O.P.*, 240 Md. App. at 550.  CJP § 3-815(c)(4) authorizes shelter care for a period of up to 30 days and permits a juvenile court to extend shelter care "for up to *an* additional 30 days if the court finds after a hearing held as part of an adjudication that continued shelter care is needed to provide for the safety of the child."  Through the reference to "an" additional 30 days (singular, not plural), § 3-815(c)(4) appears to imply that a court may grant, at most, one single extension of up to an additional 30 days beyond the initial 30 days.  Under § 3-815(c)(4), therefore, it is difficult to imagine how a shelter care case could possibly last more than 60 days, unless the deadline can be waived.  *See In re J.J.*, 231 Md. App. 304, 351 (2016), *aff'd*, 456 Md. 428 (2017), *cert. denied*, 139 S. Ct. 310 (2018) (considering whether a parent could waive the statutory deadline in CJP § 3-815(c)(4), but not deciding the issue because it had become moot when the child was adjudicated to be a CINA).  The strict limitation on the duration of shelter care is consistent with legislative measures to ensure the prompt and timely determination of CINA petitions as part of the effort to foreclose "foster-care drift," the phenomenon of children remaining in temporary placements for extended periods of time.  *See generally In re C.E.*, 456 Md. 209, 225 (2017).  We recognize that, in construing an earlier version of § 3-815(c)(4), this Court held that a court could continue to hold a child in shelter care if an adjudicatory hearing has begun, but has not been completed, within 30 days.  *In re Vanessa C.*, 104 Md. App. 452, 459 (1995).  Even then, however, we stressed that the hearing must be "completed with a reasonable degree of continuity," which meant that "a

10

## MOTION TO DISMISS THE APPEAL

The Child, by court-appointed counsel, moved to dismiss this interlocutory appeal from the order of January 22, 2019,[5] on the ground that it is moot. The Child cited Mother's failure to object to subsequent recommendations and orders, including the magistrate's recommendation of April 4, 2019, which granted Mother's request for shelter care. The Child argued that Mother had acquiesced in the subsequent request for shelter care on April 4, 2019, and subsequent orders that grant authority to the Department to consent to routine medical care for the Child.

Mother concedes that she did not object to the order for shelter care issued on April 12, 2019. Nevertheless, she points out that on May 17, 2019, after the Child moved to dismiss this appeal, a magistrate conducted another shelter care hearing, at which Mother objected to both shelter care and the grant of authority to vaccinate the child.

_____

hearing once begun must continue, insofar as possible, on a day to day basis until completed." *Id.* "The evil sought to be avoided," we wrote, was the practice of "prolonging the CINA determination for from three to five months in some cases." *Id.* But although the CINA determination in this case has now been prolonged for almost *six* months, the question of whether the statutory scheme permits multiple extensions is not currently before us because this appeal challenges only the shelter care order of January 22, 2019.

[5] CJP § 12-303(x) authorizes interlocutory appeals from any order "[d]epriving a parent . . . of the care and custody of his child, or changing the terms of such an order." The order of January 22, 2019, affirmed the order of January 7, 2019, that deprived Mother of the custody of the Child *and* changed the terms of custody to Mother's detriment by authorizing the Department to consent to vaccinations over Mother's objection. *See In re Joseph N.*, 407 Md. 278, 291 (2009); *In re Billy W.*, 387 Md. 405, 426 (2005).

Furthermore, on May 28, 2019, the same day she filed her reply brief, Mother purported to note an appeal from the magistrate's recommendation.

Based on the record before us, we are not convinced that the appeal is moot. The Child seems to contend that Mother's initial interlocutory appeal can remain alive only if she files exceptions whenever a magistrate passes on an issue relating to shelter care and files additional interlocutory appeals whenever a court denies her exceptions. We know of no statute or judicial decision that supports the Child's contention. It would not be a wise use of judicial resources to multiply the number of exceptions and interlocutory appeals that a person is required to file.

On the other hand, Mother "waived the right" to contest the shelter care order by later "consenting to continued shelter care[.]" *In re J.J.*, 231 Md. App. 304, 351 (2016), *aff'd*, 456 Md. 428 (2017), *cert. denied*, 139 S. Ct. 310 (2018). Generally, "[t]he right to appeal may be lost by acquiescence in, or recognition of, the validity of the decision below from which the appeal is taken or by otherwise taking a position which is inconsistent with the right of appeal." *Rocks v. Brosius*, 241 Md. 612, 630 (1966); *see Bowers v. Soper*, 148 Md. 695, 697 (1925) (holding that a party waived the right to appeal from the ratification of the audit of a trustee's sale when he requested and accepted that the funds be distributed as the audit prescribed). Simply put, Mother cannot contest the earlier shelter care order after she herself requested or acceded to an order of

12

shelter care. Consequently, we shall grant the motion to dismiss insofar as it concerns the January 22, 2019, order of shelter care.[6]

Mother, however, has not waived her objections to the grant of authority to consent to vaccination. Mother had consistently opposed the grant of authority to consent to vaccination, the court has stayed the Department's ability to consent to vaccination during the pendency of this appeal, and the court's subsequent orders have made it sufficiently clear that the Department may not consent to vaccination until further order. Consequently, we shall deny the motion to dismiss insofar as it concerns the grant of authority to consent to vaccination in the January 22, 2019, order.

## DISCUSSION

Under the statutory scheme governing CINA and shelter care proceedings, the juvenile court is responsible "[t]o provide for the care, protection, safety, and mental and physical development of any child" in shelter care. *See* CJP § 3-802(a)(1). In carrying out that responsibility, the court may "provide for a program of services and treatment consistent with the child's best interests and the promotion of the public interest." CJP § 3-802(a)(2).

Over Mother's objection that she opposed vaccination because of her religious beliefs, the juvenile court allowed the Department to consent to childhood immunizations. The court premised that decision on its finding "the State's interest in the

---

[6] Even if Mother had not waived her objections to the shelter care order, we would find no error or abuse of discretion, as the circuit court's conclusions were based on the correct application of the governing legal principles to the undisputed evidence before it.

13

public health and the secular welfare of the [Child] outweighs Mother's right to religious freedom." We are not persuaded by Mother's contention that the juvenile court erred or abused its discretion in doing so.

**A. Objection Under HG § 18-4A-03**

Mother argues that under Md. Code (1982, 2015 Repl. Vol.), § 18-4A-03 of the Health-General Article ("HG"), the juvenile court could not authorize the Department to consent to vaccinations over her objection. HG § 18-4A-03(a) does not support Mother's contention.

Section 18-4A-03(a) identifies the persons who may consent to the immunization of a minor "if a parent is not reasonably available." Those persons include "a grandparent, an adult brother or sister, an adult aunt or uncle, and a stepparent." *Id.* In some circumstances, they may also include a court, an adult who has care and custody of the child under a court order, or the Department of Juvenile Services. *See id.*

HG § 18-4A-03(b) imposes limitations on the authority of a person who would be otherwise able to consent to the immunization of a minor in the parent's absence. Under § 18-4A-03(b), a person may not consent to the immunization of a minor if he or she "has actual knowledge that the parent has expressly refused to give consent to the immunization"; if the parent "has told the person" that he or she "may not consent to the immunization of the minor"; or if the parent has previously given written authorization to immunization, but "has withdrawn the authorization in writing." In other words, even if a person would otherwise have the authority to consent to immunization under § 18-4A-

14

03(a) when the parent "is not reasonably available," he or she is obligated to defer to the absent parent's expressed opposition to immunization in some circumstances.

HG § 18-4A-03(d) states that a parent is "not reasonably available" if:

(1) The location of the person is unknown;

(2) (i) A reasonable effort made by a person listed in subsection (a) of this section to locate and communicate with the parent for the purpose of obtaining consent has failed; and

(ii) Not more than 90 days have passed since the date that the effort was made; or

(3) The parent has been contacted by a person listed in subsection (a) of this section and requested to consent to the immunization of the minor, and the parent:

(i) Has not acted on the request; and

(ii) Has not expressly denied authority to the person listed in subsection (a) of this section to consent to immunization of the minor.

It is beyond dispute that Mother does not satisfy the statutory definition of a parent who "is not reasonably available." Her location is not unknown; rather, she is actively litigating this case. She has not failed to communicate with a person acting in her stead; rather, she has made her opposition to immunization well known. And she has not failed to act on a request to immunize the Child or tacitly acquiesced in such a request; rather, she has gone to court to prevent the Child from being immunized.

In short, § 18-4A-03 affords no basis for Mother to oppose an order requiring that the Child be immunized. The statute simply does not apply when, as in this case, a parent appears in person to assert her objection to immunization.

15

## B. Objection Based on Religious Belief

In the juvenile court, counsel for the Child and the Department did not challenge whether Mother's objection to vaccinations was a *bona fide* tenet of her Muslim faith. On appeal, however, the Child, through counsel, cites the Dakar Declaration on Vaccination, a document formulated on March 25, 2014, by "a network of prominent African Muslim scholars and medical professionals" in support of "efforts to vaccinate children in every part of the African continent[.]" *See Dakar Declaration on Vaccination*, INTERNATIONAL INTERFAITH PEACE CORPS, https://perma.cc/UR63-QEGC. The Declaration concludes that "[v]accination is a responsibility of parents and the right of children."

We do not decide whether Mother's objection to immunization does or does not rest on a *bona fide* religious belief, because the juvenile court did not premise its decision on that ground. Instead, the juvenile court, accepting that Mother's religious objection to vaccination was *bona fide*, balanced her right to care for her children in accordance with that belief against the best interests of the Child and the public. For the reasons explained next, we conclude that the court did not err or abuse its discretion in doing so.

## C. Authority to Order Immunization

In deciding that "the State's interest in the public health and the secular welfare of the [Child] outweighs Mother's right to religious freedom," the court principally relied on *Bienenfeld v. Bennett-White*, 91 Md. App. 488 (1992), a custody dispute that involved a

conflict between one parent's religious beliefs and the child's welfare.[7]  In *Bienenfeld*, 91 Md. App. at 493, this Court held that in a custody proceeding a court may consider evidence of a party's religious views or practices "if such views or practices are demonstrated to bear upon the physical and emotional welfare of the child."  This Court also held that the chancellor did not abuse his discretion in considering that evidence.  *Id.*

Mother argues that *Bienenfeld* does not apply because this case is not a dispute between two parents about issues of custody.  Mother also argues *Bienenfeld* does not hold that a court may permit the immunization of a child over a parent's religious objections.  In our view, *Bienenfeld* outlines the intellectual framework for a decision about how a court should evaluate a conflict between a parent's religious beliefs and the welfare of a child when it places the child in shelter care.

In *Bienenfeld* both parents were members of the Episcopal church when they were married, but the mother and the children converted to Orthodox Judaism shortly before the couple separated.  *Id.* at 493.  The father agreed to the children's conversion in the

---

[7] The court also relied on *Davis v. State*, 294 Md. 370 (1982), in which the Court invalidated a statute that generally required the immunization of public school children, and permitted a parent to object only if immunization conflicted with "the tenets and practice of a recognized church or religious denomination of which he is an adherent or member.'"  *Id.* at 373 (quoting Md. Code (1978), § 7-402(b) of the Education Article).  The *Davis* Court held that the exemption violated the Establishment Clause of the First Amendment because it "contravene[d]" the "principle of government neutrality regarding different religious beliefs" by not allowing an objection by parents whose religious beliefs "are not associated with any church or denomination."  *Id.* at 381.  Under a revised version of the statute, HG § 18-403(a)(2), a parent or guardian may invoke the exemption if immunization "conflicts with [his or her] bona fide religious beliefs and practices."  *Id.*  Mother correctly acknowledges that HG § 18-403(a)(2) has no bearing on this case, because it does not concern the immunization of school children.

belief that the mother would not object if the children were exposed to his faith. *Id.* "The parties' failure to meet minds on this issue foreshadowed a series of bitter conflicts between them over the religion and education of the children." *Id.*

The conflicts involved the mother's attempts to restrict the children's access to their father because of her concern that he would interfere with their religious upbringing. *See id.* at 495; *see also id.* at 501 (stating that the record supported a finding that "the mother had attempted to restrict the children's access to the father because of her religious views"). "[T]he mother, fearing that the children's religious observances would be interrupted, sought to prevent the father from visiting the children during Passover," which coincided with their spring vacation. *Id.* at 500; *see also id.* at 501-02 (stating that the evidence showed that the mother had sought to deny the father visitation rights "on occasions when she felt that such visitation would conflict with the children's religious observances"). "There was also evidence that the children's ties to the father would be threatened if the mother were given custody." *Id*. at 502.

On the basis of this and other evidence, the chancellor granted legal and physical custody to the father, granted liberal visitation rights to mother, and ordered the father to allow the children to attend a Jewish day school as long as the children qualified and the mother paid. *Id.* at 495-96. The court later modified the order to permit one of the children to transfer to a public school, because of the "emotional stress or tension" that he experienced at the religious school and because the public school would allow him to participate in an individualized education program to address his learning disorder. *Id.* at 496-97.

On appeal, the mother contended that "the chancellor abused his discretion by giving consideration to evidence of her views and practices regarding the children's upbringing in making his custody determination." *Id*. at 503.  In reviewing that contention, this Court agreed that the First Amendment prohibits courts from weighing "the merits of different religions or different religious upbringings – including nonreligion – in resolving custody disputes." *Id.* at 504.

But "while there are clear constitutional boundaries to the authority of a court to consider religion in a custody proceeding," this Court recognized that "'a court . . . must not blind itself to evidence of religious beliefs or practices of a party seeking custody which may impair or endanger the child's welfare.'" *Id.* at 507 (quoting *In re Marriage of Short*, 698 P.2d 1310, 1313 (Colo. 1995)); *see also id*. at 510 (stating that, "[w]hile a parent has the right to inculcate religious beliefs in a child, that right is not immune from interference where, as here, there is evidence that the chosen method of such inculcation poses a threat to the child's secular well-being").  "To ignore such evidence," this Court wrote, "would be a dereliction of the duty of courts to 'monitor the welfare of children in their jurisdiction and promote the children's best interests.'" *Id.* at 507 (quoting *Kennedy v. Kennedy*, 55 Md. App. 299, 310 (1983)); *see also id.* at 510 (stating that "courts may not ignore evidence of a parent's religious views of practices which endanger the secular welfare of the child").  For that reason, this Court held that "a court in a custody proceeding may consider evidence of the religious views or practices of a party seeking custody, along with other factors impacting upon the child's welfare, to the extent that

19

such views or practices are demonstrated to bear upon the physical or emotional welfare of the child." *Id.* at 507.

In *Bienenfeld* the chancellor "found that the mother had attempted to restrict the children's access to the father because of her views regarding their religious upbringing." *Id.* at 508. "To the extent that her fidelity to her views regarding the children's religious upbringing posed a threat to the children's relationship with their father, the mother's views had a bearing upon the children's emotional well-being." *Id.* Therefore, "the chancellor did not abuse his discretion by considering evidence of the religious views of the mother in making his custody determination." *Id.* Nor did he abuse his discretion in reaching his ultimate determination, because the record contained evidence that the mother's "chosen method of inculcation pose[d] a threat to the child's secular well-being." *Id.* at 510.

The *Bienenfeld* court relied in part on *Levitsky v. Levitsky*, 231 Md. 388 (1963), another custody case. In *Levitsky* the mother's religious beliefs had led her to refuse a blood transfusion for one of her children even though the physicians told her that the child could die without one. *Id.* at 393. In reviewing an order that allowed the mother to retain custody of the children provided that she notified the court if any of the children were admitted to a hospital, the Court of Appeals stated that, "[u]nder the First and Fourteenth Amendments to the Constitution of the United States, her freedom to believe whatever she chooses is absolute, but her freedom to act is not." *Id.* at 396. Similarly, the "guaranty of religious freedom" in Article 36 of the Maryland Declaration of Rights

20

does not protect a parent who acts on his or her religious views to deny a child "medical care necessary to save his life." *Id*. at 398.

Citing cases from other jurisdictions, the Court observed that, where "there is a serious danger to the life or health of a child as a result of the religious views of a parent," a court may "bar custody by the parent holding such views," or protect the child from those views through "an appropriate order." *Id*. In the *Levitsky* case itself, the Court held that "if the children are to remain in the mother's custody, this can be accomplished, in view of her declared attitude, only by amending the decree in such manner as to provide that the mother's consent to the use of blood transfusions or of plasma for any of the children shall not be required and by specifying conditions upon which any licensed physician or surgeon in this State may administer blood or plasma when, in his judgment, the administration of blood or plasma shall be necessary to protect the life or health of any of these children." *Id.* at 400.

Mother is correct that *Bienenfeld* and *Levitsky* do not, by their terms, discuss shelter care or immunization. Those cases do, however, discuss the extent to which courts must defer to a parent's religious views when the welfare of a child is at issue. Under those cases, a parent is free to believe as she wishes, but she cannot act on her beliefs in such a way as to pose a serious danger to the child's life or health or impair or endanger the child's welfare.

This result is consistent with the broader principles that govern decisions on the placement of children outside the parental home. "When there is a conflict between the rights of the parents . . . and those of the child, the child's best interest shall take

21

precedence." Code of Maryland Regulations ("COMAR") 07.02.11.07(A). Parents have "a fundamental, Constitutionally-based right to raise their children free from undue and unwarranted interference on the part of the State, including its courts." *In re Adoption/Guardianship of Rashawn H*., 402 Md. 477, 495 (2007). But the rights of parents, although fundamental, are "not absolute" and "must be balanced against the fundamental right and responsibility of the State to protect children, who cannot protect themselves[.]" *Id.* at 497. The State of Maryland, acting through the juvenile court, has an "'interest in caring for . . . minors[] who cannot care for themselves and the child's welfare . . . is of transcendent importance when the child might be in jeopardy.'" *In re Adoption/Guardianship of Dustin R*., 445 Md. 536, 573 (2015) (quoting *In re Najasha B*., 409 Md. 20, 33 (2009)).

The purposes of the CINA and shelter care statutes include providing "for the care, protection, safety, and mental and physical development of" the children who come before the court. CJP § 3-802(a)(1). In deciding whether a child should be placed in shelter care, therefore, it is entirely appropriate for a juvenile court to evaluate whether a parent's religious beliefs pose a serious danger to the child's life or health or impair or endanger the child's welfare. The court did not err in evaluating those issues in this case and in concluding that the Mother's religious beliefs must yield to the Child's health and welfare.

Nor did the court err or abuse its discretion in authorizing the Department to immunize the Child. Under CJP § 3-802(a)(2), the court had a responsibility to "provide for a program of services and treatment consistent with the child's best interests and the

22

promotion of the public interest." The court could reasonably conclude that it was consistent with the child's best interests and the promotion of the public interest for the child to be immunized.

Here, the juvenile court determined that the significant risks to the Child and the public, if he does not receive the recommended childhood immunizations, outweigh Mother's right to religious freedom. Absent any claim of error in the underlying facts, we review that decision for abuse of discretion. *See In re O.P.*, 240 Md. App. at 577-78. When doing so, we are mindful that

> [q]uestions within the discretion of the trial court are "much better decided by the trial judges than by appellate courts, and the decisions of such judges should only be disturbed where it is apparent that some serious error or abuse of discretion or autocratic action has occurred." In sum, to be reversed "the decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable."

*In Re Yve S*., 373 Md. 551, 583-84 (2003) (citation omitted).

The juvenile court confronted a situation in which the Child was only two weeks old and was in the care and custody of the Department pending an adjudication of whether he was a CINA. The court could properly consider the well-known facts that infants of the Child's age are acutely at risk of contracting infectious diseases and other serious illnesses unless they receive the vaccinations that are recommended by authorities in pediatric medicine.[8]

---

[8] "[T]his Court is able to take judicial notice of facts 'not subject to reasonable dispute' and 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *State v. Thomas*, 464 Md. 133, 140-41

23

Among the 78.6 million children born in the United States from 1994 through 2013, "routine childhood immunization was estimated to prevent 322 million illnesses (averaging 4.1 illnesses per child) and 21 million hospitalizations (0.27 per child) over the course of their lifetimes and avert 732,000 premature deaths from vaccine-preventable illnesses." Cynthia G. Whitney et al., *Benefits from Immunization During the Vaccines for Children Program Era—United States, 1994-2013*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Apr. 25, 2014), https://perma.cc/T28J-P7KK. "Illnesses prevented ranged from 3,000 for tetanus to [more than] 70 million for measles." *Id.*

Leading pediatric and public health authorities have recommended a schedule of immunizations for infectious diseases that present a serious threat to children. *See 2019 Recommended Vaccinations for Infants and Children*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://perma.cc/UD3R-MSJW (listing recommendations of the Centers for Disease Control, the American Academy of Family Physicians, and American Academy of Pediatrics). Currently, this recommended schedule calls for a series of vaccinations over the course of an infant's first 18 months, immunizing the child from hepatitis; rotavirus; diphtheria, tetanus, and pertussis (DTaP); polio (IPV); haemophilus influenzae type b (Hib); pneumococcal disease (PCV13); varicella (chicken pox); and measles, mumps, and rubella (MMR). *See id.*

---

(2019) (quoting Md. Rule 5-201(b)). "We may take such notice on request or *sua sponte* . . . regarding a range of reliable scientific and historical data." *Id.* (citing Md. Rule 5-201(c)). These data include "reports issued by the Centers for Disease Control and Prevention, as well as other academic publications." *Id.* (citing *B.N. v. K.K.*, 312 Md. 135, 139-40 (1988)).

The serious health risks of refusing recommended childhood vaccinations are illustrated by the recent resurgence of measles. According to the most recent information published in *The New England Journal of Medicine:*

> Measles virus is one of the most highly contagious human pathogens known. In a 100% susceptible population, a single case of measles results in 12 to 18 secondary cases, on average. Two doses of measles-containing vaccine is the standard of care for the prevention of measles. . . .
>
> Measles vaccine was first licensed in the United States in 1963, after which the incidence of measles declined rapidly. Measles was certified as eliminated in the United States (i.e., no sustained transmission for >1 year) in 2000. Strategies for elimination included achieving and maintaining very high coverage with two doses of measles-containing vaccine . . . .
>
> Although the incidence of measles has remained lower than 1 case per million population, an analysis of confirmed cases in the United States between 2001 and 2015 showed that importations were leading to progressively more transmission in the United States, particularly among unvaccinated persons. From 2001 to 2016, a median of 28 imported cases of measles were documented each year . . . . Since 2016, a year in which 86 cases of measles were confirmed in the United States, the annual number of cases has increased. The number of cases reported so far this year (1077 as of June 20, 2019) is greater than the number reported in any entire year since measles was declared eliminated in 2000 and, in fact, exceeds the number of cases in any entire year since 1992. The high number of cases in 2019 is heavily influenced by three outbreaks that started in late 2018 - one in Washington State and two in New York - in close-knit, underimmunized communities. . . . The Centers for Disease Control and Prevention (CDC) reported that an important factor contributing to the outbreaks in New York is misinformation in the communities about the safety of the measles-mumps-rubella (MMR) vaccine.
>
> \*       \*       \*
>
> Field studies of the effectiveness of the measles vaccine have found high effectiveness after one dose administered at the age of 12 months or later (median effectiveness, 93%; range, 39 to 100) and even higher effectiveness after two doses (median, 97%; range, 67 to 100). . . . Two doses are needed to reach herd-immunity thresholds and terminate

25

transmission. Vaccine-induced immunity is probably lifelong in the vast majority of vaccinees.

Caren G. Solomon *et al.*, *Measles*, 381 N. ENG. J. MED. 349, 349-57 (2019) (available at 2019 WLNR 22825958 [https://perma.cc/PDK3-GF96]) (citations omitted).

"[V]accine refusal is emerging as a risk factor for measles outbreaks, and the World Health Organization (WHO) has identified vaccine hesitancy as one of the top 10 global health threats in 2019." *See* Solomon, *Measles*, *supra.* In the United States, for example, the CDC reported that the soaring incidence of measles during the first three months of 2019 "represent[ed] a 300 percent increase from the same period in 2018[.]" Catherine Offord, *US Measles Cases Break Record Since Returning to Country*, THE SCIENTIST MAGAZINE (Apr. 25, 2019), https://perma.cc/P28A-FZC9. In Maryland, after only one reported case of measles occurred during both 2017 and 2018, five cases were reported during the first six months of 2019. *See Measles,* MD. DEP'T OF HEALTHCENTER FOR IMMUNIZATION, https://perma.cc/FR74-M68P (last updated June 12, 2019).

This increase in measles infections has significantly elevated the risk to the Child if he is not vaccinated as recommended. "'The measles virus will always find unvaccinated children.'" Offord, *More Cases of Measles in America*, *supra* (quoting Henrietta Fore, Executive Director of the United Nations International Children's Emergency Fund or "UNICEF"). For children, measles complications, hospitalizations, and mortality are significant.

Similarly, it has been medically established that unvaccinated infants are at heightened risk of contracting many other infectious diseases with the potential for significant injury or death. According to the CDC, vaccinations administered from the earliest days of a child's life can substantially reduce the risks of these diseases, from infancy when the child is most susceptible, into adulthood. For example, the CDC advises parents that pertussis, commonly known as whooping cough, is a serious but vaccine-preventable respiratory disease that "can cause violent coughing fits" that are "most harmful for young babies and can be deadly." *Vaccine (Shot) for Whooping Cough (Pertussis)*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://perma.cc/49AG-7299. "Almost everyone who is not immune to whooping cough will get sick if exposed to it" "through the air when a person who has whooping cough, breathes, coughs, or sneezes." *Id*.

The CDC and pediatric disease experts advise that infants in their first year are at greatest risk from the disease:

> Whooping cough is most dangerous for babies and young children. In fact, babies younger than 1 year old who have whooping cough may:
>
> - Need to be cared for in the hospital
>
> - Develop pneumonia (a serious lung infection)
>
> - Have seizures
>
> - Suffer brain damage
>
> Whooping cough can even be deadly. Since 2010, up to 20 babies have died each year from whooping cough in the United States. Most of these

> babies don't have protection against whooping cough because they are too young to get the shots.

CDC, *Whooping Cough, supra.*

The CDC reports that, "[b]efore the whooping cough vaccines were recommended for all infants, about 8,000 people in the United States died each year from whooping cough." CDC, *Whooping Cough*, *supra*. "Today, because of the vaccine, this number has dropped to fewer than 20 per year." *Id.*

The DTaP vaccine, which immunizes children against pertussis, tetanus, and diphtheria, is recommended to be administered in a series of five doses, delivered at two, four, and six months; between 15 and 18 months; and between four and six years. *See id*.; *Tetanus and the Vaccine (Shot) to Prevent It*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://perma.cc/QB54-T3L2. According to a study published in the official journal of the American Academy of Pediatrics, "American infants are at highest risk of severe pertussis and death" of all population groups, but when "[h]ealth professionals . . . ensure on-time first-dose pertussis vaccinations as early as 6 weeks of age," such immunization provides protection "against death, hospitalization, and pneumonia." T.S.P. Tiwari *et al*., *First Pertussis Vaccine Dose and Prevention of Infant Mortality*, 135 PEDIATRICS (orig. publ. online May 4, 2015), https://perma.cc/9GEU-QKWC.

Early flu vaccination also provides life-saving protection to infants, who are "more vulnerable" than others "to serious flu illness." *Vaccine Effectiveness: How Well Do the Flu Vaccines Work?,* CENTERS FOR DISEASE CONTROL AND PREVENTION,

https://perma.cc/7KQC-MF2Q.  A study published by the American Academy of Pediatrics shows that the highest number of flu deaths are those of children under six months, who cannot be vaccinated; followed by infants between the ages of six and 23 months, who can be vaccinated, but often are not.  M. Shang *et al.*, *Influenza-Associated Pediatric Deaths in the United States, 2010–2016*, 141 PEDIATRICS (orig. publ. online Feb. 12, 2018), https://perma.cc/KM6K-CB3X.  "Only 31% of children age 6 months and older who died had been vaccinated against flu."  Lisa Schnirring, *Study Shows Youngest Kids Most At Risk of Flu Death*, CIDRAP News (Feb. 13, 2018), https://perma.cc/SR5J-YM2D.[9]

Other infectious diseases for which the CDC recommends vaccinations beginning during the first year of an infant's life include the following:

- **Pneumococcal diseases**, which include invasive bacterial infections such as meningitis (infection of the tissue covering the brain and spinal cord) and invasive pneumonia (lung infection), as well as noninvasive syndromes such as respiratory infections and otitis media (middle ear infection), which are among the "most frequent reason[s] for pediatric office visits in the United States." *Preventing Pneumococcal Disease Among Infants and Young Children*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://perma.cc/T24D-G92C.  The CDC recommends four pneumococcal conjugate vaccine doses delivered at two, four, and six months, and between 12 and 15 months. *Vaccine (Shot) for Pneumococcal*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://perma.cc/EYP7-Q7ZL.  "Children younger than 2 years old are among those most at risk for" pneumococcal disease and "most likely to have a serious case[,]" which "can lead to disabilities like deafness, brain damage, or loss of arms or legs.  About 1 out of 15 children who get pneumococcal meningitis dies." *Id.* "Rates of invasive pneumococcal disease caused by serotypes in [pneumococcal vaccines] declined by 99% in the United States since 2000[,]" when the first vaccines were licensed by the FDA. *Pneumococcal Vaccination: What Everyone Should Know*, CENTERS FOR DISEASE CONTROL AND PREVENTION,

---

[9] The acronym "CIDRAP" denotes the Center for Infectious Disease Research and Policy at the University of Minnesota.

https://perma.cc/HNS5-FGTF. Vaccinations also significantly reduce the incidence and severity of noninvasive respiratory and ear infections. *Id.* Studies show that "children who got the vaccine had fewer ear infections and fewer ear tubes placed," that "the vaccine prevented pneumonia in children" and was "effective at preventing antibiotic-resistant pneumococcal infections caused by vaccine serotypes." *Id.*

- **Rotavirus** is another common infection that "affects mostly babies and young children." CDC, *Vaccine (Drops) for Rotavirus*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://perma.cc/K4JG-838K. Rotavirus "can cause severe watery diarrhea, vomiting, fever, and abdominal pain[,]" leading to dehydration that may require hospitalization and presents a risk of death. *Prevent Rotavirus*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://perma.cc/5WPB-XFC5. The infection can be prevented by vaccinations that "should be given before a child is 15 weeks of age" and completed "before they turn 8 months of age." *Rotavirus Vaccination: What Everyone Should Know*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://perma.cc/AC7C-U33G. "Before a vaccine was available many children who became ill with rotavirus were hospitalized. Currently very few vaccinated children are hospitalized because of rotavirus illness (94% to 96% are protected from hospitalization)." *Id.*

- **Hib Disease**, "a serious illness caused by the bacteria *Haemophilus influenzae* type b (Hib)" and most commonly presenting as meningitis, is another vaccine-preventable infection for which "[b]abies and children younger than 5 years old are most at risk[.]" *Vaccine (Shot) for Hib*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://perma.cc/22VS-Q46Z. "Most children with Hib disease need care in the hospital. Even with treatment, as many as 1 out of 20 children with Hib meningitis dies. As many as 1 out of 5 children who survive Hib meningitis will have brain damage or become deaf." *Id.* Recommended vaccinations should be administered at two, four, and six months, and between 12 and 15 months. *Id.*

- **Hepatitis B** vaccinations are recommended shortly after birth because mothers "can unknowingly pass the disease to their babies at birth." *Vaccine (Shot) for Hepatitis B*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://perma.cc/V237-KM94. This "contagious liver disease" "can range from a very mild illness with few or no symptoms to a serious condition requiring hospitalization" and chronic illness causing other "serious health problems, and even liver cancer." *Id.* After the initial dose, additional doses of the vaccine should be given at between one and two months of age and between six and 18 months.

- **Polio**, a "very contagious" disease that "can cause lifelong paralysis" and death, can also be prevented by vaccinations begun during an infant's first year, at two

and four months, between six and 18 months, and again between 4 and 6 years. *Vaccine (Shot) for Polio*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://perma.cc/J425-8RC8.  Although polio was eradicated in the United States more than 30 years ago, the disease still occurs in other parts of the world.  *Id.* "[I]t would only take one person with polio traveling from another country to" expose a child and "bring polio back to the United States."  *Id.*

In light of the serious risks of harm to infants from infectious diseases, and the effectiveness of the preventive immunizations that authorities on pediatric disease say should be administered beginning within hours of birth, the juvenile court did not abuse its discretion in concluding that the State's compelling interest in protecting the health of the Child outweighs Mother's belief that vaccination contravenes her faith.  Because the court's decision is neither "removed from any center mark," nor "beyond the fringe of" acceptable health measures, we shall affirm the order of January 22, 2019, authorizing the Department to consent to such vaccinations.

**MOTION TO DISMISS GRANTED IN PART AND DENIED IN PART.  SHELTER CARE ORDER DATED JANUARY 22, 2019, AFFIRMED.  STAY OF THAT ORDER LIFTED.  COSTS TO BE PAID BY APPELLANT.**